## A. W. JONES *v.* THE STATE.

1. EVIDENCE OF MOTIVE. — The ruling in *Dill* v. *The State*, 1 Texas Ct. App. 278, cited and approved, to the effect that when the *corpus delicti* has been proved, and the circumstances indicate the accused as the perpetrator, facts tending, though remotely, to show a motive are admissible in evidence against him; but the jury should exercise great caution in attaching importance to this species of proof.

2. SAME — CASE STATED. — The worshipful master of a colored Masonic lodge being on trial for murder, there was evidence tending to inculpate him and several other members of the lodge, and expert testimony tending to show that a manuscript pinned to the corpse was in his handwriting. *Held*, in view of such evidence, it was not error to allow the State to prove that, three or four months prior to the murder, the accused, in soliciting the witness to join the lodge, assured him it was a good thing, because any one who injured a member of it would pass away and be no more heard of.

3. NEW TRIAL. — Though it is always with great hesitancy that an appellate court disturbs a verdict supported by any evidence, yet, when the issue involves life, the conviction will be set aside if the court cannot conscientiously concur in the sufficiency of the evidence on which it was based.

APPEAL from the District Court of McLennan. Tried below before the Hon. L. C. ALEXANDER.

On October 1, 1876, the body of James McCann, a freedman, was found under a tree just above the corporation limits of the city of Waco, in the county of McLennan. In the opinion of the physician consulted by the jury of inquest, life had not been extinct more than twenty-four hours. Part of a rope was around the neck of the corpse, and another part of it hanging to a limb of the tree under which it was lying. There were five bullet-holes in the neck, apparently fired at very short range, the skin being powder-burned. The ends of the rope bore indications that it had been severed by a bullet — the inference being that McCann was suspended to the tree, and then shot at.

The most significant circumstance, however, was a piece of paper pinned to the lapel of the coat on the body, which bore, written in pencil, the sentence: "This is the result of running after white women, and threatening good citizens."

On November 10, 1876, the grand jury of McLennan County presented an indictment which charged Dublin Cleaver, Jack Wallace, and Tom Vance, as the principals and actual perpetrators of the murder, and Rufus Evans, William Blocker, Edward Guest, Alexander Cox, and the present appellant, A. W. Jones, as aiders, counselors, and encouragers of the crime. All of these parties were freedmen; all, except Tom Vance, were members of the colored Masonic lodge of Waco; and all, except Vance, Cox, and Blocker, belonged to a colored church organization. A. W. Jones, the appellant, was master of the lodge and pastor of the church.

Wallace and Guest having been tried and acquitted, and the prosecution having been dismissed as to Blocker, Evans,

and Cox, leaving Cleaver, Vance, and the appellant, Jones, for trial, the latter was placed at the bar of the District Court of McLennan County, at its November term, 1877. A multitude of witnesses, nearly all negroes, were examined, and a mass of testimony elicited. The bulk of the testimony, however, has little direct bearing on the charge, but was adduced partly to explain the movements of the different parties indicted, and partly either in support or in confutation of the testimony of the accomplice, Alexander Cox, introduced as a witness by the prosecution.

This witness, Cox, testified that McCann was killed in the night of Saturday, November 30, 1876. He had heard the matter previously discussed, on different occasions. Dublin Cleaver represented that McCann, instigated and hired by some white men, was going to kill Parson Jones, the appellant, and Jones suggested that McCann be put out of the way. The witness testified to several different occasions and places at which the killing of McCann was the subject of consultation and discussion between himself, Jones, and others of the parties indicted. At witness' shop, several weeks before the murder, Jones discussed it with witness, and said McCann must be put out of the way before he, McCann, killed him, Jones; and, about three weeks before the murder, Jones gave witness two papers to give to Cleaver, saying that Cleaver would know what to do with them. One of these papers contained the sentence, "This is the result of running after white women, and threatening good citizens;" and the other, "This is what comes of running after white women." Witness gave one of these papers to Dublin Cleaver, who said it was a good way to throw suspicion on somebody else. Witness thought he gave the other paper to Rufus Evans. One night, according to the witness, he, Evans, and Cleaver, armed with a gun and pistols, waylaid points where they expected McCann

to pass; and the next morning witness told Jones about doing so, and Jones said they would wait until McCann killed him, and then it would be too late.

Soon after dark, on the Saturday night McCann was killed, Dublin Cleaver, riding a bay horse, came by witness' house and called him out. He told witness "the trick was fixed," and he wanted witness and Ed Guest, who was also present, "to be there." It was agreed to carry Mc-Cann out to "the big hollow." After Cleaver left, Guest told witness that Cleaver wanted to take McCann to the river and knock him in the head with a hammer, but that he (Guest) told Cleaver that would not do. Witness agreed to meet Guest at the edge of the prairie, and on meeting him there he got in Guest's wagon, and they went on out to the hollow. While waiting there they heard some pistol-shots, and witness remarked, "That's them boys, now." Having waited a while longer, they concluded there was some mistake about the place, and witness returned to town, Guest going on to his home in the country. As witness was on his way to town, three men came out of the hollow, from the direction of the place where McCann's body was found. They bore around witness, and the inference from his statement is that he did not recognize them. Witness had no talk with the appellant, Jones, that night, but on the next Monday they did have a talk, and Jones said to witness, "What do you think? McCann never threatened me; Cleaver did this on account of McCann's wife." Witness replied to Jones that he, witness, "had warned him these niggers were tricky, and that he ought to have been careful." Being shown the paper found pinned to McCann's body, this witness could not identify it as one of those given him by Jones, but said it was about the same size, and resembled them.

The testimony of this witness, Cox, was very lengthy, being full of details relating to his own movements and those of

other parties, and having but a collateral bearing on the case. The foregoing account of it presents only its most salient features, and those most pertinent to Jones, the appellant.

John McGee, jailer of McLennan County, testified that he had very often seen Jones writing notes, usually to his wife, which passed through witness' hands as jailer, and he examined them; and from his knowledge of Jones' handwriting, thus acquired, he was satisfied the paper found on McCann's body was in Jones' handwriting. This witness read the paper, viz.: "Result of running after white women, and threatening good citizens."

By two witnesses, the State identified a number of book-entries and signatures as the handwriting of Jones, and then introduced several expert witnesses, whose opinions concurred that whoever wrote those entries and signatures also wrote the sentence pinned on McCann's body.

Columbus Alexander, a freedman, for the State, testified that he remembered when the colored Masonic lodge was organized. Jones, the appellant, asked witness to join it, and said that it was a good thing, because if anybody molested any of the members of the order, he would pass away and nobody would ever know what became of him. This occurred three or four months before McCann was murdered. The accused objected to this testimony as irrelevant, and reserved exceptions to its admission.

The defense introduced several witnesses who contradicted various details of the testimony of Cox, the accomplice, and among them was Ed Guest, who stated that he ate supper at Cox's house the night McCann was murdered, but positively denied Cox's various statements respecting any mention of murdering McCann; denied that Dublin Cleaver came to Cox's while he was there; denied that Cox overtook or joined him after he started home; and denied ever hearing any talk of killing McCann, or of any design

of McCann to kill Jones. Witness was a member of the colored Masonic lodge, and, also, of Jones' church, and had been indicted and tried, but acquitted, in the prosecutions for the murder of McCann.

Rufus Evans and Jack Wallace also testified in behalf of the accused, and contradicted sundry statements of Cox. They denied ever hearing mention of such an enterprise as murdering McCann.

Besides the witnesses already mentioned, many were introduced on behalf of each side, resulting in a cross-fire of contradictions, which, though well sustained by both parties, need not be specifically detailed.

The jury found the appellant guilty of murder in the first degree, and the penalty of death was adjudged against him.

*Herring, Anderson & Kelley, Evans & Davis,* and *Clark & Dyer,* for the appellant.

*H. H. Boone,* Attorney-General, for the State.

WHITE, J.    The indictment in this case charges that Dublin Cleaver, and Jack Wallace, and Tom Vance murdered, by hanging and shooting, one James McCann, in the county of McLennan, on September 30, 1876. It further charges that this appellant, A. W. Jones, and four other parties (naming them), did advise, command, encourage, incite, move, procure, aid, counsel, and hire the said Dublin Cleaver, Jack Wallace, and Tom Vance to commit said murder. All the parties named were colored persons. Two of the parties had been tried and acquitted, to wit, Wallace, one of the principals, and Guest, one of the accomplices; and the prosecution had been dismissed as to three of the accomplices, to wit, Blocker, Evans, and Cox. At the time of the trial in this case the indictment was still pending against Cleaver and Vance, as principals, and this appellant, as an accomplice, to the said murder.

Appellant was alone placed on trial as an accomplice to the murder, and on November 30, 1877, he was convicted as such accomplice, and his punishment assessed at death. From this judgment of conviction he presents this appeal. The record is very voluminous, and many errors have been assigned upon which defendant claims that the judgment below should be reversed. We do not deem it necessary to discuss these errors. In the opinion of this court, most, if not all, of them have been heretofore decided, and they are not considered as well taken.

We do not think the court erred in permitting the witness Alexander to testify as to the arguments and inducements urged and held out to him by the defendant to join the colored Masonic lodge, some months prior to the homicide. Before this witness was called to the stand, the State had put in evidence the writing found pinned on the coat of the murdered man, and also the testimony of experts as to the handwriting. There is no doubt but that this evidence last mentioned pointed towards defendant, and connected him with the commission of the deed, to the extent that the experts testified that, in their opinion, this writing was his.

The correct rule under such a state of case is believed to be that held in *Dill* v. *The State*, 1 Texas Ct. App. 278, to wit:

"When the crime has been proved, and the circumstances point to the accused as the perpetrator, facts tending to show a motive, though remote, are admissible in evidence; but the jury should exercise great caution in attaching importance to this species of proof."

We have read this record with great interest, and with extraordinary care, in order to arrive at a correct and just conclusion with regard to the momentous issues depending upon the result of our investigation. The case has undoubtedly been tried with marked ability, both by the prosecution and the defense, and we have been able to find no ma-

terial errors in the rulings of the learned judge in the admission and rejection of evidence. So far as his charge to the jury is concerned, it has been aptly characterized by the counsel for defendant, both in his oral argument and his brief, as " an admirable charge." Throughout the whole proceedings the trial appears, in every respect, to have been a most fair and impartial one.

The only real question of moment on this appeal is, in our opinion, whether the evidence, as shown in the statement of facts before us, is sufficient to support the finding and judgment. We are aware that it is always with great hesitancy that an appellate court interferes with a verdict where there is any evidence to support it. Still, in the momentous issues involving the life of a human being, it is no less a province than a duty to interpose in favor of life when the verdict cannot be conscientiously concurred in.

As has been so well said by our distinguished chief justice, in *Tollett* v. *The State:*

" To sustain a conviction, it should appear, not only that an offense, as charged, has been committed, but there also should be proof tending to establish that the party charged was the person who committed it, or was a participant in its commission, to a degree of certainty greater than a mere probability, or strong suspicion. There must be legal and competent evidence pertinently identifying the defendant with the transaction constituting the offense charged against him. It is the duty of the court to require that such legal and competent evidence shall be adduced on the trial, in order to sustain a verdict of guilty. This is plainly deducible from our Code, which prescribes, as one of the grounds of a new trial, ' that the verdict is contrary to the law and the evidence ' (Pasc. Dig., art. 3137), and also that ' the Supreme Court may revise the judgment in a criminal action, as well upon the law as upon the facts; but when a cause is reversed for the reason that the verdict is contrary

to the weight of the evidence, the same shall, in all cases, be remanded for a new trial.'" Pasc. Dig., art. 3210.

"These provisions impose upon the District Court in the first instance, and afterwards on this court, the responsibility of determining whether or not there has been adduced before the jury a sufficient amount of legal and competent evidence as would render it safe to allow the verdict to stand, and become a precedent in the adjudication of offenses under the law. The performance of this duty on the part of the court is the exercise of a legal discretion and judgment as to what facts should be sufficient to rebut the legal presumption of innocence to which everyone is entitled who is put upon his trial for an offense." 44 Texas, 95 ; and see, also, *Wilson King* v. *The State*, decided at the present term, *ante*, p. 256.

We are of opinion, from the evidence before us in this case, that the testimony of the accomplice who turned State's evidence is not sufficiently corroborated in matters tending to connect the appellant with the commission of the homicide as to warrant us in holding that the evidence, as a whole, is sufficient, and that the judgment should stand.

We are, therefore, of opinion that the court erred in overruling defendant's motion for a new trial ; and for this reason the judgment must be reversed and the cause remanded.

*Reversed and remanded.*