## Bill Templeton *v.* The State.

1. Murder — Charge of the Court. — Though in a trial for murder the court below unnecessarily charged the jury on the second degree, and the accused was convicted of that degree, the conviction will not be set aside on appeal because the evidence would sustain a conviction for the first degree.

2. Principal Offenders. — All persons who act together in the commission of an offence are principals, and each may be separately tried and convicted.

3. Evidence — Presumption of Innocence. — The court below instructed the jury that the accused is always presumed to be innocent until his guilt is established by competent evidence beyond a reasonable doubt, and the burden of proof rests always on the State, and does not shift; and, therefore, if the jury have a reasonable doubt of the guilt of the defendant, they should acquit him; and if the circumstances proved can be explained by any reasonable hypothesis other than the guilt of the defendant, he should be acquitted. *Held*, not only a correct, but a sufficient instruction on the points involved.

4. PRACTICE. — Exception that the record fails to show that the indictment was returned into open court by the grand jury comes too late when primarily made in a motion for new trial.

5. SAME. — In a trial for murder, the court below submitted the case to the jury in the evening, with instructions to the sheriff to furnish them no supper, and no food was supplied them until next morning. It not being shown that the jury desired food, or objected to the order of the court, and no prejudice to the accused being apparent, *held,* that no error is perceptible.

6. SAME. — During recess of the court for dinner, the verdict was returned to the judge, who received it without a formal reopening of the court. *Held,* that under the provisions of the Code, the court, during the retirement of the jury, could properly proceed with other business, or adjourn from time to time, and nevertheless be deemed open for all purposes connected with the case before the jury. A formal reopening of the court was not necessary before the return of the verdict to the judge.

7. CONFLICT OF EVIDENCE. — It is the province of the jury to reconcile, if possible, a conflict of testimony; and, if not so possible, it is their prerogative to give credence to such of the testimony as they deem best entitled thereto; and when they have believed the State's witness in preference to the defendant's, and the court below has sustained the verdict, this court will not disturb the conviction on account of the conflict.

8. EVIDENCE. — Note, in this case, evidence held sufficient, nowithstanding a conflict of testimony, to support a conviction for murder in the second degree.

9. NEWLY DISCOVERED EVIDENCE. — To constitute cause for new trial, an application based on newly discovered evidence must clearly show that it has been discovered since the trial, and could not with due diligence have been discovered prior thereto; that it is material; that the witness will testify to it; that it is not offered to prove a new defence, or to impeach a witness who testified at the trial; that it is not cumulative; and that injustice has been done the accused. Stringent rules and the strictest scrutiny are necessary in regard to applications of this character.

APPEAL from the District Court of DeWitt. Tried below before the Hon. H. C. PLEASANTS.

The indictment was for the murder of John Hendley, in DeWitt County, Texas, on September 10, 1876, and the conviction was for murder in the second degree, with twenty years in the penitentiary assessed as punishment.

Thomas Lloyd testified, for the State, that the shooting was said to have been done in the Merchants' Exchange

Saloon, the gate to the back lot of which opens upon an alley or vacant space that leads into Church Street. Witness lives on the east corner of this alley, where it connects with Church Street. On the night deceased was said to have been killed, about eight o'clock, witness heard several shots in rapid succession at the said saloon. Immediately after the firing, witness saw three men come out of the lot gate described, into the alley, each with a pistol in his hand. The witness saw them through his window, it being a very bright moonlight night. They passed within eight or ten feet of the window, walking very fast, and going towards Gonzales Street. Witness was acquainted with John Meadow, but was not acquainted with Bill Templeton and Chamberlain at that time.

Dr. S. J. North, for the prosecution, testified that a diagram exhibited was a correct diagram of the portion of Cuero in which was situated the saloon in which deceased was killed. Witness examined the wounds of deceased, and knows he died from the wounds received at the time and place charged in the indictment. Deceased was killed during the fall or summer of 1876, and was shot about or a little before eight o'clock, p. m. Witness was in the Merchants' Exchange Saloon about ten minutes before the shooting commenced, and saw witness Keller and others in the rear room of the saloon. Some of the party were playing cards. An alley runs from Esplanade to Gonzales Street, along the south side of the saloon building. Witness, on leaving the saloon in company with witness Keller, saw three men in this alley. They were standing some thirty feet back from the sidewalk; paid no attention to them at the time, and so recognized none of them. Witness and Keller then turned, and walked to the corner of Church and Esplanade Streets, and crossed and went down Church Street to Carr's house, which is on the opposite side of Church Street from the house of witness Lloyd. The firing at the saloon com-

menced while witness was at Carr's house.    Immediately
after the firing, witness saw three men crossing Church Street
from an open space in the rear of the saloon, passing along
by Lloyd's house into Church Street.   These men were facing
witness when they stood in the alley, but when they got into
Church Street they presented a side-view to witness.    Wit-
ness was standing in the yard of Carr's house, and the men
passed within thirty feet of him, in single file, following
each other.   Witness recognized the one in front as appel-
lant.   The moon was shining brightly, and witness saw that
one of the men had a white-handled six-shooter pistol in his
hand.   Thinks it was appellant who had the pistol, but is
not certain about this.   Saw appellant as he came out of the
alley and passed witness ; is satisfied it was appellant, whom
he knows well, and has seen often, both by day and night.
Witness thought the middle man was Sitterlee, but after-
wards found he was mistaken.   The man resembled Sitterlee
in size and appearance.   Did not recognize the man behind.
Witness did not recognize appellant by his features, but by
his general appearance.   Witness knows John Meadow and
Chamberlain.   After the several shots were fired, the men
spoken of passed down Church Street to Gonzales Street,
and witness thinks they went up this last street.   Saw but
one man — thinks it was appellant — have a pistol.

M. Chaddock, for the State, testified that he was at the
saloon the night of the killing ; had been barkeeper there,
but was not at that time.   There was a game of cards going
on in the back room of the saloon that night.   Witness saw
deceased and Ed Sitterlee also in the room.   Witness left
this rear room, and went to the gallery in front, and just as
he left the rear room he saw appellant, John Meadow, and
Chamberlain pass through the saloon, coming in at the
front and going out at the back door.   Witness immedi-
ately walked forward, and as he got a chair to sit down on

the gallery, the firing commenced.   The shots were fired into the room where the men were playing cards, through the door out of which the men passed, and some shots came in through a window on the east end of the room.   When witness left the rear room, the game was being played on a table near the centre of the room, and the deceased was lying on a table that stood east and west in the room. Witness thinks he saw appellant, Meadow, and Chamberlain before the time spoken of, on that night, but is not certain; noticed no arms upon the men when they passed through. Witness saw Ferguson and Ragland in the saloon that night.   The next witness saw of appellant was next day, when he came in town, about one o'clock, with Meadow and Chamberlain.

T. Bunker, witness for the State, testified that he was at his house, on Court-house Street, which is parallel to Church Street, on the night of the killing.   About eight o'clock, witness's wife called his attention to three men near the house, two of whom witness recognized as appellant and John Meadow.   They were walking away from three horses tied about 100 yards from witness's house.   They were twenty feet from the horses when witness first saw them. Appellant turned, went back to the horses, and got something, which witness took to be a gun, from the saddle.   The three men went across the vacant lot towards the saloon. In about ten minutes, firing at the saloon commenced, and shortly witness saw three men running back the same way appellant and others had gone.   They mounted the horses and rode rapidly away.   When they got within fifty steps of witness, some one fired in their direction two or three times, one ball striking witness's fence; did not recognize any of the men this time.   Witness thought he recognized one of the horses as a well-known horse usually ridden by the Meadow boys.   Some one seemed to be following these

three, but witness does not know who, or who fired the shots towards them. Saw appellant plainly in the moonlight, at a distance of about 100 yards, and recognized him by his general appearance.

Peter Alonzo, for the State, testified that he lives on the north side of Church Street, adjoining Carr's house; that he had gone for a bucket of water on the night in question, and, when returning, heard firing at the saloon. Witness ran home, and when he got in his yard he saw three men coming out of an alley in the rear of the saloon. They passed down Church Street, in front of witness's house, towards Gonzales Street. Defendant thought he recognized appellant and Chamberlain, but did not know the third. Appellant had been in witness's store about an hour and a-half before, and purchased a cigar. John Meadow had also been in the store about an hour before. Did not see any of the three named, after the firing that night; knows the three well.

Dr. Green, for the State, testified that he saw defendant in town twice during the evening of the shooting, — first, about one half-hour before the shooting, and afterwards riding back towards the main part of town. The first time witness saw him he was in front of witness's house, on horseback, talking to some one. Appellant was often in town, but witness does not remember having seen him in town often at night on horseback.

Mr. Homerton, for the State, testified that he saw the appellant, Meadow, and Chamberlain in town that night; thinks he saw them together, but is not certain; did see the first two together; very frequently saw these three men in town together at night; examined the room in which the shooting was done, and says the room was fired into from the door and window.

Keller, for the State, testified substantially as Dr. North, only that he was inside of Carr's house when the three men

passed, after the shooting, and did not recognize, though he saw them. Dr. North was in Carr's yard at the time. Before leaving the saloon with Dr. North, Chamberlain came into the saloon through the front door, and spoke to witness, and immediately passed through and out of the same door. Witness thought he came in from the alley. When leaving the saloon, witness saw three men in the alley, but did not know them. · They seemed to be looking in at the window. Saw Chaddock on the gallery of the saloon. Did not see appellant, Meadow, and Chamberlain go out at the back door.

Stratton, for the State, testified that he had just been appointed deputy-marshal, and when he heard the firing he ran to the saloon, from a place about four hundred yards east of the saloon. When witness got to where Gonzales Street crosses Church Street, he saw two men on the opposite corner, running. They had just come out of Church Street, and were turning up Gonzales Street. Supposing them to be the men who did the shooting, witness called to them to halt, but as they did not, witness shot at them, shooting in the direction of Bunker's house. They ran to where some horses were tied, mounted, and rode off in a run. The town marshal and Sitterlee had come up by this time, and they fired in the direction taken by the two men. Witness did not recognize the two men, and at first supposed them to be black, but discovered his mistake. They wore whiskers, one longer than the other. Saw but the two, but could not have seen a man ten steps ahead of the two. Appellant wore no whiskers at that time, but Meadow and Chamberlain did; the latter wearing his the longer. Witness saw neither of these three men in town that night.

Robert Willemin, for the defence, testified that he was in the saloon the night of the killing, playing cards. Some men shot through the window of the room in which witness and others were, and shot deceased, Jones, Hall, and him-

self.  Witness knows appellant and Meadow, and saw neither that night; nor did he see the witness Chaddock at the saloon that night.  Ragland, Ferguson, witness, and others were in the saloon that night.  Witness saw the men through the window when they were shooting, but did not recognize them; nor did he distinguish their color, or the color of their coats or hats; only saw them from the waist up, but knows neither of the men at the window was appellant.  The men, on leaving, passed through the back gate of the lot.

Mike Royland, for the defence, testified that he was in the saloon a few minutes before the shooting.  He saw Chaddock there, but he left a few minutes before witness left.  Jim Ferguson and witness left together, and as they went off they saw three men in the alley looking in at the window, neither of whom was defendant, so far as the witness could know.

James Ferguson, for the defence, testified substantially to the same facts as the last witness, adding that, of the three men in the alley, one was taller than the others, but not so tall as the appellant.

*Lackey & Stayton*, for the appellant.  The testimony in the case showed a deliberate murder committed by some one, and there were no facts which could warrant the giving of a charge upon murder in the second degree, thus giving to the jury an opportunity to make a compromise verdict.

The charge should be ·upon the very case upon trial. *O' Connor* v. *The State*, 18 Texas, 363; 12 Texas, 530; 13 Texas, 175; 1 Texas Ct. App. 237.

It appears that, under the directions of the court, the jury, while considering of their verdict, were deprived of food from the time of their dinner on one day until nine o'clock, A. M., of the next day.  We believe that the barbarous practice of depriving jurors of necessary food while engaged in

the trial of a cause has passed away with the age which gave it birth, and that an attempt by any such means to obtain a verdict, carried even to the·extent that it was in this cause, is sufficient reason for a reversal.    We cannot, in the nature of things, determine the effect of such procedure, nor ought an inquiry to be made to justify the act.

The law provides a different course (Pasc. Dig., art. 3071), and in this case has been violated.   We submit that it may be said, as a matter of law, under the facts in this case, that the jury were deprived of necessary food, which probably resulted to the detriment of the appellant.

We submit that the testimony in this case, circumstantial as it was, was not sufficient to authorize a verdict, when taken in connection with the testimony of the only witness who actually‧ saw the parties at the time the killing occurred.

The motion for a new trial, supported by the affidavits of William Scrogins, the witness, and of the appellant, ought to have been sustained.   He shows diligence, want of prior knowledge of the testimony, and its materiality.   27 Texas, 752 ; 13 Texas, 175.

From the bill of exceptions it appears that the court adjourned at noon, and that the verdict was delivered to the judge at a time when the court was not open.   We submit that such a practice is not sanctioned by law, under a proper construction of article 3087.   All proceedings in a criminal trial must·be done in open court.

*W. B. Dunham,* Assistant Attorney-General, for the State.

ECTOR, P. J.   The appellant was indicted at the December term, 1877, of the District Court of DeWitt County, for the murder of one John Hendley.   At the June term, 1878, of the same court, he was tried, and convicted of

murder in the second degree, and his punishment assessed at confinement in the penitentiary for a period of twenty years.

Several errors have been assigned, which we will consider in their order.

1. That the court erred in charging the jury on murder in the second degree. It is contended, on the part of the appellant, that the testimony in the case showed a deliberate murder committed by some one, and there were no facts which could warrant the giving of a charge upon murder in the second degree.

It is believed that the evidence is of such a nature as to warrant a charge upon murder in the second degree. The charge upon murder, both in the first and in the second degree, is a clear, correct, and distinct enunciation of the law. And the fact that the court submitted a charge upon implied malice is in appellant's favor, and he cannot be heard to complain. We have examined the cases cited by appellant, and they do not sustain his position. When a defendant is indicted and tried for murder, although the facts may not imperatively require a charge upon implied malice, still, if one is given, and the jury find the defendant guilty of murder in the second degree, this would not require a reversal of the judgment, although the appellate tribunal should believe that the facts proved would sustain a verdict of murder in the first degree. *Powell* v. *The State*, decided at the Tyler term, 1878, *ante*, p. 234.

2. This assignment also refers to the charge of the court. There is an abundance of evidence in the statement of facts tending to show that there were three persons acting together in the commission of the murder when Hendley was killed. The portion of the charge of the court which is specially referred to in the second error assigned, and which instructed the jury that all persons who act together in the commission of an offence are principals, and each may

be tried and convicted separately of the offence, correctly presented the law of the case as made by the proof. Pasc. Dig., art. 1809.

3. The refusal of the court to give the special instructions asked by the appellant is the next error assigned. Most of the special charges asked by appellant, abstractly considered, are correct legal propositions ; and in refusing to give some of them the court would have committed an error but for the fact that the charge of the court covered the same ground, and is perfectly unexceptionable both in form and spirit. One of these special charges asked is copied from the opinion of this court in the case of *Black* v. *The State*, 1 Texas Ct. App. 391, and is in regard to the sufficiency of circumstantial evidence required to warrant a conviction.

The third paragraph of the charge of the court is as follows : " The accused is always presumed to be innocent until his guilt is established by competent evidence, beyond a reasonable doubt, and the burden of proof rests always upon the State, and does not shift ; and if the jury should, therefore, have a reasonable doubt of the guilt of the defendant in this case, they should acquit him ; and if the circumstances as disclosed by the evidence can be explained, in the opinion of the jury, upon any other reasonable hypothesis than that of guilt of the defendant, he should be acquitted." This charge, as regards the proof in cases of circumstantial evidence, laid down the rule of law correctly, and any additional instruction on the point was entirely unnecessary.

The objection to the indictment, that the records of the court do not show that it was returned by the grand jury into open court, comes too late when raised for the first time in the motion for new trial. We are satisfied from the recitals in the transcript before us, if the point had been made in time, that it would not have been well taken.

The fifth assignment of error is based upon the supposi-

tion that the court deprived the jury of their necessary food while in retirement in this case, and that this action of the court probably resulted to the detriment of the appellant. It appears from a bill of exceptions taken by the appellant, that after the court had submitted his charge to the jury, he "then instructed the sheriff not to give the jury any supper, but that the jury retired and were not permitted to have supper or breakfast until the next day at nine o'clock, A. M.; and that after the adjournment of the court for dinner, and before opening court, the verdict of the jury was returned to the judge, but the court was not opened for the purpose of receiving the verdict." It is the duty of the sheriff, in all criminal cases, to supply the jury with such necessary food and lodging as he can obtain.    Pasc. Dig., art. 3071.

The exception taken to the order of the court in regard to the management of the jury does not show that it was made without their consent, or that the jury at any time desired food, or that the instructions complained of could have injured the rights of the appellant. If any of these facts existed, they could have been easily established by proof. From the bill of exceptions, and the daily proceedings of the trial, as given in the transcript, it plainly appears that the jury received the charge of the court on the evening of June 20, 1878, and retired to consider of their verdict; that on the morning of June 21, 1878, they were supplied with breakfast at nine o'clock; that after eating breakfast they again retired for further deliberation; and having finally agreed upon the verdict, they returned the same into court on the said 21st day of June.    Before the verdict was returned, the court had adjourned for dinner.

It would be a violent presumption, and one not warranted by the facts, for this court to hold, under the circumstances, that the jury were deprived of the necessary food, which probably resulted to the detriment of the appellant; or that

it was the intention of the court below to coerce a verdict by directing the sheriff not to furnish the jury with supper. After the court had adjourned for dinner on June 21st, and it came to the knowledge of the judge presiding on the trial that the jury had agreed upon their verdict, he was not required by law to have any formal announcement made that the court was in session, before receiving the verdict. The court may, during the retirement of the jury, proceed to any other business, and adjourn from time to time, but shall be deemed open for all purposes connected with the case before the jury. Pasc. Dig., art. 3087.

The record shows that the appellant was duly arraigned, and pleaded not guilty to the indictment. We deem it, therefore, unnecessary to notice further the sixth assignment of error.

We will depart from our usual custom, and give a detailed statement of the most material facts in this case. The testimony shows that Hendley was shot in the back room of a saloon in the town of Cuero, in the county of DeWitt, about eight o'clock at night, during the summer or fall of 1876, by parties from the rear and outside of the saloon.

Lloyd, the first witness, testified : "I heard several shots fired, in rapid succession, at the Merchants' Exchange Saloon, about eight o'clock on the night that a man was said to have been killed there. Immediately after the firing, I saw three men come out of the gate of the lot in rear of said saloon; said saloon forming one side of the inclosure of said lot, the gate opened upon an alley or vacant space that led into Church Street. The three men came out of this gate and passed down the alley into Church Street, and then turned in the direction of Gonzales Street. The men were walking fast, and each of them had a pistol in his hand; they passed within eight or ten feet of me. I was in my house, and saw them through the window. *   *   * I was acquainted with John Meadow, but not with Bill Templeton

or Chamberlain, at that time.   The night was a bright moonlight."

Dr. North, the second witness, testified :  *  *  *  "I saw the deceased after he was shot.   I examined his wounds ; the wounds caused his death.   He lived about twenty hours. *  *  *   I was in the Merchants' Exchange Saloon about ten minutes before the firing occurred, and I saw witness Keller and others in the rear room of said saloon, some of them playing cards.   I did not see the defendant, Templeton, there.   *  *  *   When I passed out of the saloon, I saw, in an alley that runs from Esplanade Street back to Gonzales Street, and along the south side of the saloon building, three men.   They were standing in the alley, some thirty feet back from the sidewalk, but I did not recognize them. I paid no attention to them.   Keller and myself then turned, and walked to the corner of Church and Esplanade Streets, and crossed and went down Church Street to Carr's house, which is on the opposite side of Church Street from the witness Lloyd's house, and a little west.   The firing at the saloon commenced while I was at Carr's house.   Immediately after the firing, I saw three men coming in the direction of Church Street, along an alley or open space in the rear of the saloon ; they passed along by Lloyd's house, and into Church Street.   While they were in the alley they were facing me.   At the time they came out of the alley and passed down Church Street I was standing in the yard in front of Carr's house ; they passed in about thirty feet of me.   The men were following after each other ; the one in front I recognized as the defendant.   One of the men had a white-handled six-shooter in his hands.   I thought it was the defendant.   The moon was shining brightly, and I saw him as he came out of the alley, and as he passed me.   I am satisfied it was defendant.   I know him well ; had seen him often in the day-time and in the night.   I took the man in the middle to be Sitterlee, but I afterwards found I was

mistaken; the man behind I did not recognize.   *   *   *
I did not recognize defendant by his features or size, particularly, but from his general appearance.   *   *   *   The
three men passed on down Church Street to Gonzales
Street; think they turned the corner, and went up Gonzales
Street.   *   *   *   Church Street is fifty or sixty feet wide.
*   *   *   I heard a few shots fired in the direction they
went."

Chaddock, the third witness, testified: "I was at the
Merchants' Exchange Saloon the night John Hendley was
shot; there was a game of cards going on in the rear room
of the saloon at the time the firing commenced. I had been
for some time in the saloon.   *   *   *   I left the rear room
and went to the gallery in front of the saloon. Just as I
left the rear room, I saw the defendant, John Meadow, and
Chamberlain pass through the saloon; they came in at the
front door. I immediately walked forward, and just as I
drew a chair to sit down on the gallery the firing commenced. The shots were fired into the room where the
men were playing cards, through the door out of which I
saw the three men pass, and through a window to the right
of the door.   *   *   *   I did not see the defendant, or John
Meadow, or Chamberlain again that night. I saw these
three men come in town the next day about one o'clock,
together; that was the next I saw of them. I was well
acquainted with them at that time."

Bunker, the fourth witness, testified: "I was at my house
in Cuero, on Court-house Street, which is a parallel street
with Church Street, and north of it. On the night John
Hendley was killed, about eight o'clock, my wife called my
attention to some men near the house. I stepped out in
the yard, when I saw the defendant, John Meadow, and
another man walking away from some horses hitched about
one hundred feet from my house. They were about twenty
feet from the horses when I first saw them; two of the

horses seemed to be tied to the same tree; the other one was a little distance off. * * * The men were about one hundred feet off. I could see them plainly; the moon was shining very bright. The defendant walked back to the horses, and got something I took to be a gun. The three men then went on across a vacant lot, in the direction of the Merchants' Exchange. In about ten minutes I heard firing at the Exchange. In about two minutes more, I saw three men running back the same way the defendant and the others went off. When they got within about fifty steps of me, some one fired from the direction in which they came, two or three times, and a shot struck my fence near where I was. I then passed around my house, into the door. A minute afterwards, I went out into the yard again, when I saw two of the men riding off in a gallop, and the third one just mounting his horse, who immediately also rode off in a lope. * * * There seemed to be some one running after the three men as they came back; don't know who he was. * * * I recognized the defendant in the moonlight by his general appearance."

Alonzo, the next witness, testified: " On the night Hendley was killed I was in Cuero, on the north side of Church Street, on the lot adjoining Carr's house, and opposite and a little east of Lloyd's. I had gone for a bucket of water, and was about fifty yards from my house, in the street, when the firing commenced in rear of the Exchange. I immediately ran home; and when I got in my yard, I saw three men coming out of an alley in rear of the Exchange, in a little run. They passed down Church Street, in front of my house, towards Gonzales Street. I thought I knew two of the men, but I was not certain. I took one to be defendant and another to be Chamberlain. * * * I soon heard firing in the direction in which they went."

The witness Howerton testified: " I saw defendant in the town of Cuero on the night Hendley was killed; can't

say the exact hour; think it was about one hour before the killing. I saw the defendant and John Meadow. I also saw Chamberlain, and I am of the impression I saw the three men together; am not certain of this. I know I saw defendant and Meadow together. * * * I did not see either of them after the shooting.''

The witness Stratton testified: '' I was about 400 yards from the Exchange Saloon at the time of the firing. I ran direct towards the saloon. I had been appointed assistant marshal that day. * * * When I got to Gonzales Street, at the point where it is crossed by Church Street, I saw on the opposite corner two men, running. They had just come out of Church Street and turned to go up Gonzales Street. Supposing them to be the men who had done the firing, I called them to halt, but they paid no attention to me. They turned into a vacant lot, and ran in the direction of Bunker's house, on Court-house Street. I followed them, and fired on them. I shot in direction of Bunker's house. They ran on to where some horses were tied, mounted them, and rode off in a run. * * * I saw only two men running; did not recognize them. * * * If there had been a man ten steps ahead of them I would not have noticed him. * * * If there was another man with the two men I saw, he would have been ahead.''

Willemin, a witness introduced by appellant, being sworn, says: '' Was present when Hendley was killed. He was shot between eight and nine o'clock. I, with others, was playing cards, when some one fired through the window and shot Hendley, and Jones, and one Hall, and me. I know defendant and John Meadow; did not see them in the Exchange that night. I, Jim Ferguson, and Henry Ragland, and others, were in the Exchange. I saw the men through the window when they were shooting, but did not recognize them. I saw them plainly, and neither of them was the defendant or Meadow. I did not know Chamber-

lain.  *  *  *  I did not see Chaddock at the Exchange that night.  *  *  *  I saw no one shooting through the door; don't know the size of the men; know nothing of the size of the room; did not know Chaddock at the time. *  *  *  Was sitting with my back to the door. Ed Sitterlee was sitting in front of me; was shot just as he raised up from his seat. Three shots were fired before he got up; just as he got up he was shot. There was no smoke in the room; had a distinct view of them; could not tell what the complexion of the men was, — what sort of clothes or hats they had on. They poked their heads through the window; witness was about seven feet from the window; saw the men from the waist up."

Ragland, another witness for appellant, testified: "I was in Cuero when Hendley was shot; was in the Exchange about a minute or two before the shooting commenced. Witness left with Jim Ferguson, Esq. We started out of the bar-room for the hotel, and, as we passed the alley, saw three men; and two of these men, he thinks, had guns. The men were fourteen or sixteen steps from witness; they were looking through the window.  *  *  *  He knew the defendant and Meadow; did not recognize either of them among the men in the alley; thinks he might have recognized the defendant if he had been one of the three men; don't think he would have recognized Meadow; did not see Meadow or defendant in the Exchange while he was there."

Ferguson, another one of the witnesses for defendant, testified to about the same facts as the witness Ragland.

There was a conflict in the evidence; it was the duty of the jury to reconcile this conflict, if they could; and if they could not do this, to give credence to such of the witnesses whose testimony, in their opinion, was best entitled to it. The correct rule in such cases is laid down by the Supreme Court in the case of *Seal* v. *The State*, 28 Texas, 491,

where the court held that it is the province of the jury to reconcile a discrepancy or conflict of testimony, if possible, and if not, to give credence to the party who, in their opinion, is best entitled to it; and when, in a criminal case, the jury have seen fit to believe the witnesses for the State in preference to those of the defendant, and the judge who tried the cause below has not seen fit to set aside the verdict of guilty, on the motion for a new trial, the conviction will not be disturbed in this court. We believe, after a careful examination of the entire evidence adduced on the trial, both on the part of the prosecution and the defence, that it was sufficient to warrant the verdict.

This brings us to the most material question presented in the record, and we are free to admit that we have had some difficulty in deciding it. The twelfth ground in defendant's motion for a new trial in the court below was on account of newly discovered evidence, and is as follows: "Defendant asks the court to grant a new trial in this case for the further reason of the newly discovered evidence contained in exhibits A and B, hereto attached, being the testimony of Wm. Scrogins and Lucinda Banks." Exhibit A is as follows, viz.:

"State of Texas
        v.           }  No. 1269.
"Bill Templeton.

"Personally appeared before me, the undersigned authority, Wm. Scrogins, who, being sworn, on oath says that at the time that one John Hendley was killed, in Cuero, DeWitt County, on or about September, A. D. 1876, he, affiant, was just at the public well, and the defendant, Bill Templeton, whom he knows well, and did at that time, passed by him, and was talking to a negro woman, Sindie, and said affiant heard him, said Bill Templeton, say somebody is killed. This was just as the firing commenced, and there seemed to be three or four shots at that time, and then

many more followed. Witness walked north, near Kleberg's law-office, and turned up towards the town; and passing by Frumie's store-house, saw three men coming down the street in a run, and turned up north by the corner where the restaurant or eating-house is now, and went up that street north, with pistols in their hands. I did not know the parties; know Bill Templeton, and know that I saw said three men coming down the said street, towards said eating-house, just after the last shot was fired; saw said three men until they mounted their horses, near Neches's house, — being tied to a black-jack near said Neches's house, — and said party then rode off north in a run."

The above affidavit has the name of William Scrogins signed to it, and is duly sworn to by him before a proper officer

Exhibit B is as follows: "Personally appeared before me, the undersigned authority, Judy Banks, who, on oath, says that her daughter Sindie, who died last Wednesday, soon after the arrest of Bill Templeton, and also a few days before her death, stated to affiant that it was wrong to punish Bill Templeton for killing John Hendley, about September, 1876, in the town of Cuero. Said Sindie stated that she was talking with said Bill Templeton near the public well in Cuero, in said State, and county of DeWitt, at the time the shooting occurred, when said deceased, Hendley, was killed."

Exhibit B appears never to have been signed nor sworn to by Judy Banks.

Then follows the affidavit of Bill Templeton, who, on oath, says that the testimony of William Scrogins, and declarations of Sindie Banks, made just before her death, are important to his just defence; that the evidence aforesaid has come to his knowledge since the trial of said cause, and that it was not owing to a want of diligence on part of defendant that it was not discovered before trial; that affiant

believes the testimony of said Banks and William Scrogins is material, and will produce a different result upon a new trial. Said exhibits A and B are referred to so as to show what affiant expects to prove by said witnesses; that said affiant lives in said county and State, and expects to procure the attendance of Judy Banks and William Scrogins upon another trial, if a new trial is granted.

Courts find it necessary to lay down stringent rules, and to scrutinize such applications with great strictness, to prevent the mischiefs which would otherwise be produced. It is easy to claim the discovery of new evidence, when the claim is really unfounded.

One of the grounds prescribed by the Code of Criminal Procedure for a new trial in cases of felony is: "Where new testimony material to the defendant has been discovered since the trial. A motion for new trial based on this ground shall be governed by the same rules as those which regulate civil suits." Pasc. Dig., art. 3137.

Before a new trial should be granted on this ground, it must clearly appear (1) that the additional evidence is newly discovered; (2) that it is material; (3) that the witness will testify to it; (4) that it could not have been produced at the trial by the use of due diligence; (5) that the evidence is not offered to prove a new defence; (6) that it is not offered to impeach a witness; (7) that the evidence is not cumulative; (8) that injustice has been done him.

The Supreme Court of California say: "The party applying on the ground of newly discovered evidence must make his diligence apparent; for if it is even doubtful that he knew of the evidence, he will not succeed in his application. * *. * Much must be left to the discretion of the judge below in passing upon these applications, and we should interfere with great reluctance with his action." *Baker* v. *Joseph*, 16 Cal. 180.

The Supreme Court of Oregon say: "Caution is par-

ticularly necessary when the motion is founded on newly discovered evidence, both because it opens a temptation to perjury, and because its abuse would give an unfair advantage by allowing a party to take the chances of success with a part of his witnesses, and, if not successful, to avoid the consequences of his venture by a new trial, while his adversary would be remediless if unsuccessful at either trial." *Lander* v. *Miles,* 3 Or. 43.

The Supreme Court of Georgia say: " Applications for new trial on the ground of newly discovered evidence will be closely and critically scanned by the court." *Wallace* v. *Tumlin,* 42 Ga. 462.

The Supreme Court of this State say: " Such motions are received with careful scrutiny, and are held to address themselves very much to the discretion of the court; and where the court has refused an application made upon this ground, the appellate court will not reverse, unless it shall appear that the court below has not exercised its discretion according to the established rules of law." *Mitchell* v. *Bass,* 26 Texas, 372.

This court, in the case of *Gross* v. *The State,* 4 Texas Ct. App. 249, has held that, to warrant a new trial on account of newly discovered evidence, the application must satisfy the court that the knowledge of the new evidence has been acquired since the trial, and that the delay in discovering it is not attributable to want of due diligence. *Williams* v. *The State,* 4 Texas Ct. App. 255.

The testimony referred to in exhibit B would not be admissible if a new trial was granted. Eighteen months intervened between the filing of the indictment in this case and the trial in the District Court.

This court judicially knows that there has been an examination of the facts of this case on an application under *habeas corpus,* on appeal from the District Court, which was decided by this court at its Galveston term, 1878.

Appellant's attention must have been directed to the importance of proving where he was at the exact time that Hendley was shot. It does appear to us it would have been one of the most natural things imaginable for him to have remembered that he was talking with the woman at the well, who is referred to in the affidavit of Scrogins; and the sworn statement of appellant, that it was on account of no want of diligence he did not discover this evidence sooner, was well calculated, in the court below, to cast suspicion on his application.

And we also believe that reasonable diligence and care in the preparation of the case should have stimulated him and his friends, in view of the long time he has had for the purpose, to have extended his inquiries throughout the length and breadth of the town of Cuero, and the surrounding country, and that, if this had been done, Scrogins's testimony could have been discovered before the trial. The administration of the law is not to be delayed or turned aside by the neglect or cunning of persons charged with crime.

We deem it unnecessary to notice any of the other errors assigned.

A very strong appeal has been made to obtain a new trial, and if it appeared that the court below, in its action upon the motion for new trial, had not exercised its discretion according to the well-established rules of law, a new trial would now be granted by this court; but, believing otherwise as this case is presented, the judgment must in all things be affirmed.

*Affirmed.*