## LEE WALKER vs. THE STATE.

COURT OF APPEALS, TYLER TERM, 1883.

*Murder—Indictment—Arrest of Judgment.*—Indictment for murder alleged that the defendant in manner and by means and with instruments and weapons unknown to the grand jury did, feloniously, wilfully, and of his malice aforethought, deprive the deceased of his life; and embraced in the concluding part the words : "and then and there kill and murder." *Held* that the indictment was sufficient to charge the offense of murder, the statute authorizing the means and weapons, if unknown, to be so alleged, and the words "deprive of life" being tantamount to kill and murder; further, that the concluding part of the indictment explicitly charged murder; wherefore a motion in arrest of judgment was properly overruled.

*Evidence—Expert Testimony—Standard of comparison in proof of handwriting.*—See this case for evidence held sufficient to establish the competency of a witness to testify as an expert upon handwriting, and the competency of certain written instruments used in evidence as standards of comparison.

*Murder—Express Malice—Charge of Court.*—Express malice is an element of murder in the first degree which must be proved and cannot be inferred. It is not required that it be demonstrated with mathematical precision, but the evidence must be sufficient to satisfy and convince the jury, but it may be direct or circumstancial. The actual existence of express malice is manifested by external acts or circumstances which may transpire before, at the time of or immediately after the killing. See a case which demanded a charge on murder of the first degree.

*Practice in the Court of Appeals—Evidence.*—Notwithstanding the general practice of this court to refuse to disturb the verdict of the jury when the evidence, though conflicting, is sufficient, if believed, to support the finding, this court will not hesitate to set aside such a verdict when it appears that it is wrong, and it is clear that injustice has been done the defendant. Note the opinion *in extenso* on the question.

*Same.*—In passing upon the facts of a case on appeal, this court is governed by the following rules : 1. When the evidence is conflicting, and there is sufficient, if believed, to prove the case of the state, the jury being the exclusive judges of the credibility of the testimony, their verdict will not be set aside, unless it clearly appears to be wrong. 2. When there is no testimony to support it, the verdict will be set aside. 3. Where the evidence is insufficient to rebut the presumption of innocence, the verdict will be set aside. 4. Where the verdict is contrary to the weight of evidence, it will be set aside.

*Murder—Corpus delicti.*—Before a conviction for any degree of homicide can be had, the death of the party alleged to be dead must be clearly established, and a dead body or portions of a dead body must be found, and clearly identified as the body or parts of the body of the person alleged to be dead. These are pre-requisites to the legal conviction of one accused of murder, however cogent may be the other inculpatory facts proved against him; and this proof must be so clear, and so far beyond a reasonable doubt, that not even will the extra judicial confession of the accused, that he killed the person alleged to have been killed, uncorroborated by other evidence of death, warrant a conviction.

*Same—Fact Case.*—Note a state of facts held insufficient to support a conviction

for murder in the first degree, because it fails to establish the death of the alleged murdered person, and because it fails to identify the body found as that of the alleged murdered person.

Appeal from Hood County.

*McCall* & *McCall, Cooper* & *Estes* for appellants.

*Assistant Attorney General Burts* for State.

STATEMENT.

In order to impart a clear understanding of the rulings of the court, so much of the inculpatory evidence as is not summarized in the opinion is here outlined. It was testified that, according to his own statement, the defendant went to the town of Weatherford on, April 29, the morning after the disappearance of Mathis. Some time in July, he stated to a witness, that he met Mathis in that town, on April 29, and inveigled him into a game of cards with himself and a stranger, that the stranger won $20 from Mathis which Mathis refused to pay the stranger, but agreed to pay him if he would purchase the claim. That he secured the claim, and in order to pay him, Mathis gave him a note for $80 on Ed. Mathis in Mississippi with written authority to collect it. That he delivered the note to a bank for collection. That the bank collected the money some two weeks afterwards but refused to pay him the money and demanded his right to receive it. That not having his authority with him, he gave the bank an indemnity bond and received the money.

The transaction concerning the note so far as the bank and the indemnity bond was concerned, was corroborated by the cashier of the bank and the indemnifying surety. The cashier testified that he paid the money on the check which he saw the defendant sign. This signature and a letter to J. C. Mathis, signed "Lee Walker," the defendant having admitted to a witness that he wrote such a letter, were made a standard of comparison, upon which the cashier testified as an expert.

In the opinion of the witness as an expert, an authorization to Lee Walker to collect the note, signed "W. B. Mathis," a subsequent receipt from Lee Walker of $80, signed "W. B. Mathis," a letter to J. C. Mathis, signed "Lee Walker," a letter to Ed. Mathis, signed "W. B. Mathis," postmarked at Weatherford, July 5, and a letter to sheriff Stribling detailing a fight between Lee Walker and horse thieves, and subsequent agreement between the thieves and W. B. Mathis to kill the defendant, signed "one on a scout," were

written by one and the same hand as that of defendant, whom he saw sign the check.

To three of the witnesses, one of whom was the sheriff, the defendant, at different times subsequent to July 25, gave a detailed account of a fight he claimed to have had with three horse thieves at his father's lot, on the night of July 25, in which he was certain he killed one and thought he killed two. To one of the witnesses he declared that W. B. Mathis was the thief he killed, to two others he averred that he believed W. B. Mathis to be the thief he killed.

The letter, signed "one on a scout," purported to be from a confidant of the horse thieves; gave an account of the fight; averred the death of the two men injured in the fight, and stated that their bodies had been thrown into the Brazos river.

The sheriff testified that he showed the letter to the defendant on the 10th of August and that he displayed great nervousness and excitement.

The witness Jones, who saw W. B. Mathis on the evening of Apr. 28th, before his disappearance, testified that the defendant went to Weatherford on the morning of the 29th. On his return he claimed that he had seen W. B. Mathis in Weatherford, and that Mathis had given him his old clothes. These clothes the witness Jones bought of the defendant. The letter of July 5, addressed to Ed. Mathis and signed W. B. Mathis, which the expert witness testified was in the defendant's handwrighting, represented that W. B. Mathis, the purported writer, was on his way to the silver mines in Mexico. The cashier of the bank declared himself a practiced handwriting expert.

Opinion by Willson, J.

This appeal is from a conviction of murder in the first degree; the murder of a W. B. Mathis, the penalty assessed being confinement in the penitentiary for life.

1. A motion in arrest of judgment having been made by the defendant, and overruled by the court, which motion is based upon alleged defects in the indictment, it is proper that we should first consider and dispose of the questions presented by the motion.

After alleging, in the usual form, an assault upon W. B. Mathis, the indictment proceeds : "And that he, the said Lee Walker, him, the said W. B. Mathis, in some way and manner, and by some means, instruments, and weapons, to the the grand jurors unknown, did then

and there feloniously, wilfully, and of his express malice afore-thought, deprive of life, so that he the said W. B. Mathis, then and there instantly died. And so the grand jurors aforesaid, upon their oaths aforesaid, do say and present, that he the said Lee Walker, him the said W. B. Mathis, in manner and form aforesaid, feloniously, wilfully by and of his express malice aforethought, did then and there kill and murder."

In two particulars, it will be noticed, this indictment is unusual in form. 1. It does not allege the means, instrument or weapon with which the murder was effected. 2. Instead of alleging in the language of the statute that the defendant did *kill* the deceased, it substitutes the words did "deprive him of life."

As to the first mentioned peculiarity, it is well settled that it is sufficient to allege that the murder was committed "in some way or manner, and by some means, instruments and weapons, to the jurors unknown." Com. vs. Webster, 5 Cush. Rep. 295; State vs. Wood, 53 N. H. 484; State vs. Burke, 54 Id. 92; State vs. Williams, 7 Jones N. C. 446; People vs. Cronin, 34 Cal. 191; People vs. Martin, 47 Id. 96; Com. vs. Martin, 125 Mass. 394; 1 Whar. Prec. 114; Whar. Cr. Ev. Sec. 93; Arch. Cr. Prac. and Pl. 787, note 1.

As to the second, we are of the opinion that the words "deprive of life" are equivalent to the word "kill," and even if they were not, the concluding portion of the indictment distinctly charges that the defendant did *kill* and murder the deceased. We think the indictment, though departing from the usual form, in the particulars we have mentioned, is sufficient, and that the motion in arrest of judgment was properly overruled. Droyer vs. The State, 12 Tex. 535.

2. Upon the trial certain letters and other writings were introduced in evidence by the prosecution, mainly upon the testimony of a witness who was permitted to testify as an expert, that in his opinion the letters and other writings were in the handwriting of the defendant. This witness based his opinion upon having once seen the defendant write his name, and upon comparing the letter which the prosecution claimed had been established as the writing of the defendant. These letters and other writings were objected to by the defendant upon the ground, that the handwriting used by the witness as a standard of comparison, was not sufficiently established as the writing of the defendant. We are of the opinion that the standards were clearly established in full compliance with the rules of

law governing in such cases. Eborn vs. Zimpelman, 47 Tex. 503; Philips vs. The State, 6 Tex. App.364; Hatch vs. The State, Id. 384; Heacock vs. State, 13 Tex Ct. App. 97.

No question is made as to the competency of the witness to testify as an expert. He fully qualified himself to testify in that capacity. We are clearly of the opinion that the court committed no error in admiting the evidence objected to by the defendant.

3. It is objected to the charge of the court, that it should not have embraced murder in the first degree; that there was no evidence proving or tending to prove express malice on the part of the defendant, and that therefore, the charge should have been confined to murder in the second degree.

While express malice must be proved, and cannot be inferred, still, like other facts, it may be proved by circumstantial evidence. Its actual existence is manifested by external acts, and these external acts or circumstances may transpire before, at the time of, or immediately after the killing. McCoy vs. The State, 25 Tex. 33; Guitau vs The State, 11 Tex. Ct. App. 544; Jackson vs. The State, 9 Tex. Ct. App. 144; Richarte vs. The State, 5 Tex. Ct. App. 359.

It is not required that express malice should be demonstrated to mathematical certainty by the evidence; all that is required is, that the evidence be such as is reasonably sufficient to satisfy and convince the jury of its existence. We think the evidence in this case ont only authorized, but required the court to charge upon murder in the first degree.

If the defendant killed Mathis, the evidence, in our opinion, would well warrant a verdict that he committed the act with express malice. It was a question for the jury alone to determine, and the learned trial-judge was correct in submitting to them the issue. We find no error in the very able and impartial charge of the trial-judge.

4. We come now to the consideration of the most serious and difficult question in this case, and that is : Does the evidence support the verdict of the jury ? It is insisted by the assistant attorney general that it was the peculiar province of the jury to determine the facts, and that this court has no authority to set aside the verdict, when there is *any* evidence to sustain the verdict in this case.

With reference to the authority of this court to set aside a verdict, when the verdict is, in any judgment, against the weight of the evidence, or not supported by it, we think the statute confers it.

Art. 870 of the Code of Crimnal Procedure provides : "The court of appeals may revise the judgment in a criminal action as well upon the law as upon the facts; but when a cause is reversed for the reason that the verdict is contrary to the weight of the evidence, the same shall, in all cases, be remanded for a new trial."

With reference to trials by jury, it is provided : "The jury are the exclusive judges of the facts in every crimnal cause. C. O. P. Art. 676. And again it is provided : "The jury in all cases are the exclusive judges of the facts proved, and the weight to be given to the testimony, except, &c." C. C. P. Art. 728.

While Article 870 above quoted expresly confers the authority to revise the facts, and to reverse the judgment for the reason that the verdict is contrary to the weight of the evidence, it has been the general practice of this court, to refuse to set aside a verdict where the evidence was conflicting, but when there was sufficient, if believed, to support the finding. Addison vs. The State, 3 Tex. Ct. App. 40; March vs The State, Id. 335; Lockhart vs. The State, Id. 567; Blake vs. The State, Id. 581; Baltzeager vs. The State, 4 Tex. Ct. App. 532; Reardon vs. The State, Id. 602; Ridout vs. The State, 6 Tex. Ct. App. 249; Slaughter vs. The State, 7. Tex. Ct. App. 123; Brown vs. The State, 8 Tex. Ct. App. 48; Douglas vs. The State Id. 520; Bright vs. The State, 10 Tex. Ct. App. 68; Jones vs. The State, 12 Tex. Ct. App. 156.

But even in such case, when it was manifest that the verdict was wrong, and it was clear that injustice had been done the defendant, it has been set aside, though there was evidence sufficient to support it. March vs. The State, 3 Tex. Ct. App. 335; Lockhart vs. The State Id. 557; Blake vs. The State, Id. 581; Templeton vs. The State, 5 Tex. Ct. App. 398; Gamble vs. The State, Id. 421, Johnson vs. The State, Id. 423.

And it has never been doubted, but has always been admitted by this court, not only that it had the authority, but that it was its duty to set aside a verdict where that verdict was contrary to the evidence, or unsupported by it, though it is with reluctance that the court will disturb a verdict when there is any evidence to sustain it. King vs. The State, 4 Tex. Ct. App. 256; Jones vs. The State, 4 Tex. Ct. App. 436; Tollett vs. State, 44 Tex. 95; Jones vs State, 5 Tex. Ct. App. 86; Barnell vs. State, Id. 113.

The law imposes upon the trial court in the first instance, and af-

terwards on this court, the responsibility of determining whether or not there has been adduced before the jury a sufficient amount of competent evidence as would render it safe to allow the verdict to stand and become a precedent in the adjudication of offenses under the law. The performance of this duty on the part of the court is the exercise of a legal discretion and judgment as to what facts should be sufficient to rebut the legal presumption of innocence to to which every one is entitled who is put upon his trial for an offense.

Numerous cases appear in the reports, both of our Supreme Court and of this court, where verdicts have been set aside because unsupported by the evidence, or contrary to the weight of the evidence. From a careful consideration of the cases in which this subject has been discussed, we deduce the following rules of practice governing this court, viz :

1. When the evidence is conflicting, and there is sufficent, if believed, to prove the case of the state, the jury being the exclusive judges of the credibility of the testimony, their verdict will not be set aside unless it clearly appears to be wrong.

2. When there is no testimony to support it, the verdict will be set aside.

3. When the evidence is sufficient to rebut the presumption of innocence, the verdict will be set aside.

4. When the verdict is contrary to the weight of the evidence, it will be set aside.

Believing, therefore, that we are not only authorized, but that it is our duty to pass upon the sufficiency of the evidence to sustain the conviction in this case, we will proceed to a consideration of the facts as presented in the record, for the purpose of answering the question before propounded, "Does the evidence support the verdict of the jury ?"

To sustain this conviction what was the first fact essential to be proved by the prosecution ? Evidently, the death of W. B. Mathis, the person charged to have been murdered by the defendant. Upon this fact rests the entire case. It is the ground-work and foundation of the prosecution, and without this primary fact being clearly established beyond any reasonable doubt, there can be no conviction for any grade of homicide in this case, no matter how cogent may be the other facts proven against the defendant. Our penal code contains this preemptory provision : "No person shall be convicted of

any grade of homicide unless the body of the deceased, or portions of it, are found and sufficiently identified to establish the fact of the killing." P. C. Art. 549. At common law, without this provi- sion of our code, a conviction for homicide would not be warranted until the death of the party charged to have been killed was clearly established, though there was evidence exhibiting satisfactory indi- cations of the guilt of the accused. Wilson vs. The State, 41 Tex. 320; 3 Greenl. Sec. 131; Stark. Ev. 862–3; 1 Bish. Cr. Pro. 1056; 2 Hale 290;. 1 Arch. Cr. Pr. & Pl. 798. Mr. Wharton says : "The death should be distinctly proved, either by direct evidence of the fact, inspection of the body, or by circumstantial evidence strong enough to leave no ground for reasonable doubt." Whar. on Hom. 629 *et seq.* At common law, however, it was not always essential, as it is under the provisions of our code which we have cited, for the prosecution.to produce and identify the body, or portions of it, of the person alleged to have been killed. Whar. on Hom. Sec. 630; 1 Bish. Cr. Pro. 1057. But it has always required that the proof of the death should be clear and satisfactory beyond reasonable doubt, insomuch that not even the extra judicial confession of the accused that he had killed the person charged to have been killed, would of itself, uncorroborated by other evidence of the death, be sufficient to warrant a conviction. 1 Bish. Cr. Pri. Sec. 1058; Whar. Cr. Ev. 632.

But, without further considering the subject 'as governed by the rules of the common law, we will look alone to the express provision of our code, by which we must be controlled in determining this question. There is no room to doubt the plain meaning of the pro- vision cited. It requires an identification, by sufficient proof of the dead body, or portions of it. It is indispensable that a dead body, or portions of a dead body should be found, and equally as indispensa- ble, that when found, it should be clearly proved to be the body or portions of it, of the person alleged to have been killed. In the case before us, a portion of the skeleton of a human body was found. In regard to this skeleton and the finding of it, the evidence is substan- tially as follows : About the 10th day of August, 1882,it was found by a witness named Thomas, floating in the Brazos river, at the town of Richmond in Fort Bend county. It was floating down the river with the face down, the feet and back partly of the water, so that witness could see that it was a human body. Witness pulled the

body to the bank of the river by means of a rope. He describes it as follows : "I found that the head, one arm and the other hand were missing; that the body had on two pair of pants, a pair of drawers, and shoes and socks, and that the upper portion of the body had on no clothes at all. When I dragged the body to the bank some one present raised the question as to whether the body was the body of a white or black man, and I took a knife that I found in the pants pocket on the body and split a hole in the clothing on the thigh and found that it was the body of a white man. The body h ad on what I took to be ducking pants over a pair of pants of different material, and the body, when I found it, had some mud on it, and the stomach, bowels, and all the entrails were missing, and pretty much all the flesh. The clothes were sound, that is, not torn in any way."

A witness named Floyd buried the body, and he described it thus : "The body had on two pairs of pants, a pair of drawers, and shoes and socks." This witness states that the body he buried was the same one that the witness Thomas took out of the river; that two weeks after he buried it Dr. Doyle hired him to dig it up, and Dr. Doyle took from it parts of the clothing and one of the shoes and one of the socks, and that the socks were striped. Witness identified a shoe exhibited to him at the trial as the shoe that Dr. Doyle took from the body. Dr. Doyle testified that about the 25th of August, 1882, he employed the witness Floyd to exhume a dead body at Richmond, Texas; that the body was without a head or neck; one arm and the shoulder blade of the arm, and the hand from the other arm were gone; The flesh was all gone from the ribs, and body; there was nothing but some tendons about the ribs, but no muscle or flesh, and none in the pants, but some corrupt, decayed matter. The body had on two pairs of pants, but no suspenders; the outer pair or pants were of coarse cassimere, woolen, and their color was gray, the under pair of pants were of checked tweeds. The body also had on a pair of ordinary brown drilling drawers; also a pair of ordinary kip shoes, not heavy. Witness cut off a portion of the legs of each of the pairs of pants, and brought them away with him, also one of the shoes and one of the socks on the body; the sock was a cotton sock with red stripes, two or more inches in breadth around the top of the sock, and the foot of the sock was red. Witness also exhibited a buckhorn handled, two-bladed knife, larger than medium size which he stated was taken from the body.

We have recited all the testimony descriptive of the dead body found, and the clothing upon it. It is claimed by the prosecution that the skeleton was the remains of W. B. Mathis, who it is alleged was murdered by the defendant in Hood county, on the 28th day of April 1882, about four months prior to the time of the finding of this skeleton.

We will now examine the evidence as to the identification of the skeleton found as being that of the alleged murdered man, W. B. Mathis. It is claimed by the state that the defendant murdered Mathis on the night of the 28th of April, 1882, in Hood county, within a half mile of the Brazos river, and threw the body of the deceased into the river, and that the body was carried by the waters of the river to the place where it was found by the witness Thomas, which is proved to be between six and nine hundred miles distant by the meanderings of the river, from the place where the murder is alleged to have been committed. If the theory of the prosecution is correct the body had been conveyed by the river a distance of at least six hundred miles, and found in the condition it was shown to be in, some four months after the murder. While it is not impossible that the body may have made this long and difficult journey, it is shown by the testimony of two physicians, that it was not probable. Dr. Doyle testified, "that it was possible that a dead body might float from the one point to the other, but that it was not at all probable." Dr. Lancaster testified that such a thing would be possible, but not probable. Thus we see the theory of the prosecution, to start with, is based upon an improbability, and hence it is all the more essential that the proof should be clear and convincing that the skeleton found was that of W. B. Mathis. There is no direct evidence establishing it as such.

What are the circumstances relied upon by the state as identifying the skeleton as being that of Mathis ? First, that on the night of April 28 1882, W. B. Mathis, who was living at the house of defendant's father, in Hood county, mysteriously disappeared, and has not since been seen or heard from. It is not to be denied that the circumstances in evidence, are strongly in favor of the assumption that W. B. Mathis came to his death on the night of April 28, 1882. His mere disappearace, however, and his not being seen or heard from since, while sufficient to create a presumption that he no longer lives, are far from sufficient to warrant the conclusion that he is cer-

tainly dead. He was a young man, not long in the State, a laboring man, and with no family or ties of any kind to cause him to remain in any particular locality, and he might have left his temporary residence and wandered to some distant place, and be yet living. Instances of such disappearances, unaccountable at the time, have often occurred, and years afterwards, the person believed to be dead have been found to be still living. But the mysterious disappearance of Mathis, while of itself wholly insufficient to establish the fact of his death, is nevertheless a circumstance tending to prove that fact, and tending also, although in a normal degree, to identify the skeleton found, as his remains.

Second, the defendant was in possession of property which belonged to Mathis, soon after the disappearance of the latter, and claimed this property as his own. This fact and many other suspicious acts, declarations, writings, and conduct of the defendant, subsequent to the disappearance of Mathis, are claimed as circumstances, which not only show that the defendant murdered Mathis, but which also tend to identify the skeleton found as that of the murdered man. While such evidence may be perfectly legitimate for the purpose of identification as well as for the purpose of connecting the defendant with the crime, the facts still remain to be proved, by other evidence than this, that the remains found were beyond a reasonable doubt the remains of W. B. Mathis.

Third, it is contended by the state that the remains found are identified as those of Mathis by the clothing, &c., upon the same.

Let us examine the testimony upon this point. First, as to the pants. The skeleton had on when found two pairs of pants. Witness Thomas who found the remains states : "The body when I found it had on what I took to be ducking pants over a pair of different material." Witness Floyd who burried and afterwards exhumed the remains does not describe the pants. Witness Dr. Doyle who had the body exhumed, and who preserved portions of the pants, says : "The outer pair of pants were a coarse casimere, woolen, of a gray color, the under pair were checked tweeds." Henry Jones testified that he saw W. B. Mathis about sun down of the day on which he disappeared, April 28 1882; that he then had on a pair of ducking pants of the same kind which witness at the time of testifying had on, and which were brown cotton ducking. This witness while testifying was shown the pieces of pants taken from the

body by Dr. Doyle, and testified in regard thereto, that he had not seen them before. It is contended by the state that there is a conflict in regard to the pair of pants. We do not think so. The witness Thomas does not state positively that the outer pair of pants found upon the remains were ducking, but only that he took it to be ducking. Dr. Doyle states positively that the material of the outer pair of pants was coarse casimere, woolen, of gray color, and he not only states this, but produces in court a portion of the pants demonstrating that the material was casimere and not ducking. We are therefore forced to the conclusion that the outer pants found upon the remains were not made of cotton ducking, and yet the state's witness Jones, who last saw Mathis, and who saw him on the very evening of his disappearance, is positive that he then had on cotton ducking pants, and not casimere pants such as were found upon the remains. It cannot be said therefore that the outer pants identify the remains as those of Mathis; and as to the other pair of pants found upon the remains there is no suce evidence whatever to prove that they belonged to Mathis.

2. As to the brown cotton drawers found upon the remains there is no proof that Mathis ever had such drawers. His brother testified on the trial that W. B. Mathis had very few clothes; that he bought one pair of cotton flannel drawers after he came to Texas but he says nothing about his having such drawers as were found upon the remains.

3. As to the shoes; those found upon the remains were ordinary kip shoes, not heavy, and number 10 is size. It was proved that W. B. Mathis wore number 10 shoes, and the witness Jones, who last saw Mathis, said that he then had on shoes similar to the shoe taken from the remains by Dr. Doyle. Upon this point Jones testified as follows : "The shoes were of the same kind as the shoe exhibited to me—that is they look like the same shoe shown me. I cannot say that this is the same shoe. The shoes were of the same kind as this one, that is, they, as this is, were of the kind that tied with a string, not gaiters or button shoes." This is all the evidence which tends to prove that the shoes upon the remains were the shoes of W. B. Mathis. All that it proves is that Mathis wore shoes, when last seen, of the same quality, make and number as those found upon the dead body; and it is safe to say, that at that same date, there

were five hundred other men in Texas, who were wearing shoes in all respects similar to those.

4. As to the socks. The socks found upon the remains were striped cotton socks, with red feet. It is not shown that Mathis had such socks. It was proved by his brother, that when he last saw W. B. Mathis, he had some white woolen home-made socks. This is all the evidence we have in relation to those socks.

5. As to the knife. There is no evidence identifying the knife found, as one belonging to W. B. Mathis. We have now noticed in detail all the evidence of identification offered by the remains, and we must say that it is not only insufficient to identify the remains found as those of W. B. Mathis, but that to our minds it leads to a contrary belief. We are not even informed by the evidence as to the height, size and weight of W. B. Mathis, and as to the height, size and probable weight of the person whose skeleton was found. These facts could certainly have been ascertained and proved, and would have weight in determining the question of identity. An anatomist could ascertain from the skeleton found, almost, if not precisely, the height, size and weight of the individual while living, and would detect, if it existed, any peculiarity in the conformation of the bones of the body, such as a formally fractured bone, a misshapen hand, foot, arm or leg, etc., and which peculiarity if discovered might lead to the certain identification of the remains. But no effort whatever seems to have been made on the part of the prosecution to adduce any proof of this character, and no reason is assigned why the effort was not made. Dr. Doyle who testified that he is a physician must be presumed to have a knowledge of human anatomy, and he examined the skeleton in question; yet, we are not even told by him what was the size, height, sex or race of the individual who once animated it. Wilson vs. State, 41 Tex. 320; Same Case, 43 Tex. 472.

Fourth. It is claimed that the circumstance of identification exists in the fact that the remains when found had on no shirt. It was proved that on August 12, 1882, two shirts were found hidden in the brush on the premises, where Mathis is alleged to have been murdered. These shirts were badly mildewed and were quite rotten.

They were exhibited in court on the trial, and J. C. Mathis, the brother of the alleged murdered man, testified in regard to them as follows: "I recoguize the shirt exhibited to me as being exactly

like one which I knew my brother had when he was at Dr. Walker's. My mother made it for him for an undershirt before we left home. It is a home-made undershirt. The shirt was small for my brother. The other shirt I know nothing about." This is all the evidence relating to the shirts. It by no means proves that these garments belonged to Mathis; nor that they were placed where found by defendant. It certainly does not prove that they had ever clothed the body, the remains of which were found more than six hundred miles distant from where the shirts were found.

After a most careful and thorough consideration of all the evidence in the record, we are compelled to say, that in our judgment, the state has failed to prove, in the first place that W. B. Mathis is dead, and in the second place, if in fact he is dead, that the remains found were his.

Were it necessary we could cite many cases, stronger in their facts in proof of the *corpus delicti*, than the one before us, where it has been held that the evidence of the death, and of the identification of the body were insufficient to warrant a conviction of homicide.

Counsel for the defendant, in argument, presented a most important question which it is not necessary to a disposition of this case that we should definitely determine. We have not had the opportunity to investigate the authorities, if any, which may bear upon it, and we shall go no further at present than merely to call attention to it, leaving its final determination for the future, should the question ever present itself in such a shape as to demand a decisive solution. It is contended that the provision of the penal code, Art. 549, which we have before quoted, requires not only that the body, or portions of it shall be identified, as that of the murdered man, but but that it shall be identified so as to establish the fact of killing; that is, that the body or the portions of it found and identified, must exhibit evidence sufficient to prove that the individual was killed; that is, that the death was produced by violence and not by natural causes.

Because, in our opinion, the evidence does not identify the body of the alleged murdered man, and does not establish clearly his death. The judgment is reversed and the cause remanded.