## JAMES BRIGHT *v.* THE STATE.

1. CHARGE OF THE COURT.— See "statement of the case" for a charge of the court *held* to be a correct exposition of the law of homicide and responsive to the issues presented by the evidence.

2. PRACTICE IN THIS COURT.— There being two contrary theories advanced on the trial and supported by evidence, and the jury having given credence to that of the State, and the trial judge having refused a new trial, this court will not disturb the verdict.

APPEAL from the District Court of Fannin. Tried below before the Hon. R. R. GAINES.

The indictment charged the appellant with the murder of his father, George C. Bright, in Fannin county, on the 10th day of February, 1875. He was convicted of murder in the second degree and awarded twenty-two years in the penitentiary.

The judge's charge, upon which the main issue arose on appeal, is here incorporated in full, as directed by the court. After the caption, the charge reads:

"The defendant is charged by the bill of indictment, which has been read before you, with the crime of murder in the first degree, alleged to have been committed upon the body of George C. Bright; and, having been duly arraigned, has entered his plea of not guilty.

"Under the indictment the defendant may be found guilty of murder in the first degree, or of murder in the second degree, or of manslaughter, or not guilty, as the evidence may warrant under the instructions which I shall give you in this charge.

"Where one man intentionally kills another, it depends upon the circumstances attending the killing whether the act is justifiable or not, and, if not justifiable, of the degree of his guilt.

"Every person who unlawfully kills another in this State with malice aforethought, either express or implied,

is deemed guilty of murder.   Malice in this definition is used in its legal sense and signifies the intentional doing of a wrongful act without legal justification or excuse, or circumstances of mitigation.   Hence when a killing occurs and the circumstances are absent which would excuse or justify the killing, or reduce it to manslaughter, the law implies malice in the killing and it is murder.

"When the malice is implied merely, it is murder in the second degree; but when the malice is express it is murder in the first degree.   Express malice is when one, with a sedate and deliberate mind and formed design, kills another, which formed design is evidenced by external circumstances discovering that inward intention, such as former grudges, antecedent menaces, deliberate compassings or concerted schemes to do him some serious bodily injury.

"Manslaughter is voluntary homicide committed under the immediate influence of sudden passion, arising from an adequate cause, but neither excused nor justified by law.   It is meant by this, that the offense must be committed under the immediate influence of the passion aroused at the time of the killing, and must not be the result of some former provocation.   By 'adequate cause' in the above definition is meant that the passion (which may be either anger, rage, sudden resentment or terror) must spring from some provocation sufficient to produce, in the mind of a man of ordinary temper, such a degree of some one of these mental emotions as to render him incapable of cool reflection.

"Homicide is justifiable and subject to no punishment when committed in self-defense or in defense of any third person, under the following limitations:  Self-defense is when one is unlawfully attacked by another in such manner as produces in his mind a reasonable fear or apprehension of death or of some serious bodily injury from the attack, and kills his assailant in order to protect him-

self. Homicide is permitted in defense of another person, but it must reasonably appear, by the acts or by the words coupled with the acts of the person killed, that he intended to take the life of such third person, or to deprive such third person of some member of the body. In addition to this, the killing must take place while the person killed was in the act of committing the offense, or after some act done by him showing an evident intention to commit such offense.

"Having given you the general definition of the several degrees of homicide, so far as the evidence in this case renders the definition proper, I will give you the general rule of evidence which is to guide you in making up your verdict. The defendant is presumed to be innocent until his guilt is established by legal evidence; and in case of a reasonable doubt as to his guilt, he is entitled to be acquitted.

"I therefore charge you that, if you believe from the evidence beyond a reasonable doubt that defendant, in Fannin county, at any time before the finding of the indictment in this case, shot George C. Bright with a shotgun, and thereby killed him, you will inquire into the circumstances attending the killing as shown by the evidence, in order to determine whether he is guilty or not, and if guilty, what is the degree of his guilt; and in doing this, you will be governed by the following instructions:

"If, at the time of the killing, George Bright was advancing upon the defendant and made such demonstration as to produce in the mind of defendant a reasonable expectation or fear of death, or of some serious bodily injury, and defendant killed him in order to protect himself, defendant is not guilty. In such case, in order to justify defendant, it is not necessary that the danger should be real. It would be sufficient if the appearances were sufficient to produce in his mind a reasonable apprehension of the loss of life or of some serious bodily harm.

" Or if George Bright had threatened to take the life of defendant, and defendant knew of the threats, and, at the time of the killing, George Bright by any act then done manifested an intention to execute the threat so made, then defendant is justifiable. But if George Bright at the time of the shooting was making no demonstration showing an intent to carry his threat into execution, the threats would not constitute a justification.

"Furthermore, if defendant shot George Bright in order to protect his mother, and if at the time of the shooting it necessarily appeared from the acts, or the words coupled with the acts of the deceased, that it was his (deceased's) purpose and intent to take the life of defendant's mother, or to maim her by depriving her of any member of her body, and if at the time deceased had done some act showing evidently an immediate design to execute such purpose and intent, defendant is justifiable; and in determining this question you have a right to consider any threats made by the deceased against the life of defendant's mother (if any) or any previous act of his showing a deadly hostility towards her (if any has been by the testimony). But I charge you that such previous threats or demonstrations would not of themselves constitute a justification unless at the time of the killing he was doing some act manifesting an immediate intention to execute such threats. Unless you are satisfied by the evidence beyond a reasonable doubt that defendant was not justified under the instructions above given, you will find him not guilty. But if you are so satisfied that defendant's act was not justifiable, and if you find from the evidence that defendant killed the deceased under the immediate influence of sudden passion arising from some provocation sufficient to render a man of ordinary temper incapable of cool reflection, you will find defendant guilty of manslaughter.

" If you find that defendant killed George Bright, and

you are satisfied beyond a reasonable doubt that the act was not justifiable, and that it was not committed under the immediate influence of sudden passion, arising from some cause adequate to reduce a killing from murder to manslaughter, you will find defendant guilty of murder; and if you are further so satisfied beyond a reasonable doubt, that, at the time defendant formed the design to take the life of the deceased, his mind was calm and deliberate, and capable of cool reflection, and that he took the life of the deceased in pursuance of such design, you will find him guilty of murder in the first degree; but if you do not find that the murder took place in pursuance of such deliberately formed design, you will find him guilty of murder in the second degree.

"Defendant is not only entitled to the benefit of any reasonable doubts as to his guilt, but also as to the degree of his guilt.

"You are the judges of the facts, of the credibility of the witnesses, and of the weight of the testimony.

" If you find defendant guilty of murder in the first degree, you will assess his punishment at death or confinement in the penitentiary for life, as you may determine in your own discretion.

" If you find him guilty of murder in the second degree, you will assess his punishment at confinement in the penitentiary for any term not less than five years.    If you find him guilty of manslaughter, you will assess his punishment at confinement in the penitentiary for any term not less than two nor more than five years.

" If you find defendant not guilty, you will simply say so by your verdict."

The evidence discloses about this state of case: J. W. McElwee, for the State, testified that he lived at the time of the killing, and had lived for some years, about a quarter or a half mile from the home of deceased in Fannin county.    Early in the morning on the day of the

homicide, but after sun-up, the witness was in his field, and heard a gun fire from about the house of deceased, and heard some one exclaim "Lord have mercy." He thought then that it was the deceased, though it may have been some other member of the family. Within twenty or thirty minutes thereafter, Henry Bright, son of the deceased, came for the witness and asked him to go to the house. The witness, in company with J. S. Carpenter, went to the house about one hour after the firing of the gun, and found the deceased lying dead in the yard, about ten steps south of the house. No one was near the body when witness and Carpenter arrived. The two took the body into the house and laid it on the bed. When the witness reached the body of the deceased the hair and beard were wet and uncombed, and drops of water were clinging to the beard. No weapons were found on his person, but an ordinary pocket knife and a bunch of keys were in his pocket. There was a wound in the left side of deceased, which appeared to have been made by a load of shot. The shot appeared to have gone through the muscles of the left arm, between the elbow and shoulder, tearing a large hole, penetrating the left side, and ranging downwards and backwards, and they appeared to have gone in in a bunch and without scattering much. The wound was sufficient to cause death. There was a pool of blood where the body lay, but witness saw no blood elsewhere, but looked for none. The defendant is a son of the deceased and lived on the place with him. The witness did not see him on the place that morning. This all occurred in Fannin county, Texas, in the latter part of February, 1875.

J. S. Carpenter, for the State, testified to the same effect as McElwee, and, in addition, that in November, 1874, the deceased was preparing to fight a duel with one Rool, whom he accused of being too intimate with his wife. Deceased was immediately apprehended, brought before

W. E. Dailey, justice of the peace of Fannin county, and placed under bond to keep the peace towards Rool and all other persons for one year. Deceased refused to give bond and was confined in the Fannin county jail for two or three weeks, when he changed his mind, gave bond and was released; the witness, A. Yoakum, A. J. Nicholson and W. B. Allen, becoming sureties on the peace bond. After his release, the deceased went to the house of witness and remained there a week or two, and then went home, and was killed fifteen or twenty days afterwards. Witness was .at the deceased's house the day before the homicide, and about nine or ten o'clock, A. M., heard the deceased tell his little boy, Henry, to go with him to the field to pick cotton. The boy refused, saying his mother had directed him to do some work about the garden. The deceased thereupon whipped him severely, but not more than witness thought was deserved. The last the witness saw of deceased, he was pushing the boy, Henry, before him towards the cotton patch. The deceased was then staying at home.

On this same day — the day before the killing — in the evening, the defendant came to the witness in his field, and requested him to surrender the deceased on his peace bond. The witness asked why, and the defendant replied that the deceased was abusing his family. The witness asked him, then, if he referred to the chastisement of Henry in the morning, and defendant replied that he did. The witness then declined to do as requested, saying that he believed deceased had a right to control his family. The defendant then rode off, saying, "if the worst must come to the worst, the sooner the better," and appeared angry and dissatisfied with his father. The deceased had a large family of children.

John A. Stanley testified, for the State, that he lived on the deceased's place at the time of the homicide, in a house about one quarter of a mile from the deceased's

house, east.   He heard the shot on the morning of the
killing, and went to the house within twenty or thirty
minutes afterwards.   He met the defendant near the gate
some hundred yards from the house, with his saddle-bags
on his arm, going towards his horse which was saddled
and hitched at the gate.   The defendant said to witness,
"the difficulty is settled at last between me and pa."
Witness asked, "how?" and defendant replied, "I have
killed him."   The defendant told witness then that the
deceased was not armed.   The witness asked the defend-
ant what the deceased was doing when killed, and he re-
plied that he was "cutting up," abusing and villifying
him, defendant, and his mother.   He asked the witness
then what he should do, and witness told him that if it
were he, witness, he would leave.   Defendant returned
to the house with witness, saying he would bid his mother
and sisters farewell; he then left and witness saw no more
of him until about one year before this trial, when he saw
him in the Fannin county court house.

A few days before the killing the defendant told the
witness that the deceased had refused to let him, defend-
ant, have a pair of mules unless he should take them by
force; that he then took a gun and started toward the lot,
when the deceased asked him, "what he was going to do
with that gun?"—that he replied, "You told me that I
would have to take them by force of arms, and I am do-
ing so."   Defendant told the witness that he took the
mules.   The witness further testified that, a few days
before the homicide, he heard the deceased say that he
would control his family or he would kill every one of
them.   He, witness, saw Henry Bright's arm the evening
after he was whipped, and it was beat blue.   The defend-
ant told witness, the day before the killing, that he had
been to see Jake Carpenter to ascertain if the deceased's
bondsmen were going to permit the deceased to beat his
children to death; that Carpenter insulted him, and he

told Carpenter that if the worst must come to the worst, the sooner the better. The witness was the first to reach the dead body. There were no weapons about the body.

R. C. Stanley, who lived about one mile from the scene of the killing, testified for the State that, a few days before the occurrence, the defendant was at his (witness') mother's house, and said that he had just returned from Honey Grove. The defendant spoke of the difficulty between his father and mother, and said that if he had to leave the country, he would leave his mother out of distress, and that he would "settle" the next "fuss" that came up. The witness' mother said to him, "For God Almighty's sake, Jim, don't never think of killing your father." The defendant repeated that if he had to leave the country he would leave his mother out of distress. He had some buck-shot in his hand at the time, and spoke of them in connection with his father, but the witness did not remember the words he used.

Smith Lipscomb testified, for the State, that he had been sheriff and deputy sheriff of Fannin county for six years, and remembers the time of the killing of deceased. Very soon after the killing a writ for defendant was placed in his hands and he made diligent search for, but failed to hear anything of defendant. About a year before this trial defendant telegraphed him from Honey Grove, that he was there, and to come and get him. Witness went and arrested him there.

R. T. Williamson, who was on the coroner's jury at the inquest on the body of deceased, testified to the character of the wound, asserting that from appearances the deceased, when shot, must have been in a stooping position, or else the person shooting must have shot from higher standing ground than that occupied by deceased. This witness stated that he had no prejudice in this matter; that he had declined overtures of several to undertake the making up of a purse to defray the expense of defendant's

---

---

capture, but did agree to contribute five dollars for that purpose.

Nicholson and Adams both testified that before the shooting defendant requested them to surrender deceased on his peace bond, assigning no other reason than that deceased was "cutting up." Adams refused, and Nicholson agreed to do so on condition that the other sureties would.

Mrs. Amanda Bright testified for the defense that she was the wife of the deceased and the mother of the defendant. She had been separated from her husband from the 2d day of November, 1874 (on which day he accused her of improper intimacy with a man named Rool), up to the day of the killing. She was then the mother of ten living children by the deceased, and within two months of her eleventh confinement, and in a very helpless condition. On the morning he first accused her, November 2d, 1874, the deceased threatened to bring men to prove her want of virtue, and said that she should leave and take none of the children with her. Deceased said on this occasion that if the men did not state that witness was guilty, and if she then did not acknowledge it, he would kill her; and to the defendant he said: "Jimmie, if you do not stop taking sides with your mother, I will put you out of the way." At this time the youngest child of witness was upon its death-bed. On the next day, the deceased said that he had seen the man and he would not acknowledge, and that now if witness did not he would put her out of the way. At the same time he said to the defendant, who was standing near, that he, defendant, was taking sides with witness, but that it would do no good — that he would put defendant out of the way too; that defendant should not always be around to protect witness.

A few days subsequently the deceased sent for Adam Yoakum and his wife to stay all night at the house, be-

cause he, deceased, was going to fight a duel with Rool. Early next morning witness and defendant were sitting in witness' room, near the chimney, between which and the wall there was a large crack. While sitting there she saw the muzzle of a gun run through the crack, and defendant, who saw it at the same time, jerked her behind the door, out of range. Just before the gun was run through the crack, some one made an effort to open the south door of the room. The door was about to give away, when Mr. and Mrs. Yoakum rushed into the room and to the door, and Mr. Yoakum told defendant, who was about to open the door, not to do it, that the deceased was there with a gun. Mr. Yoakum and defendant then pushed the door to. Deceased demanded that they open the door, as he wanted to bid the baby good-bye. Mr. and Mrs. Yoakum took the baby to the shed-room, and witness saw no more of deceased that day. He and Yoakum went off together in the direction of Honey Grove.

Shortly after his return from jail, the witness thinks in December, the deceased came to the house and approached witness with both hands in his pockets, and with a very vicious look on his face. The defendant stepped between the deceased and witness, and deceased ordered him to go to his work at the stable. The defendant answered that he would not as long as witness was in danger.

About the 13th or 14th of February the deceased left, and said he was going to Bonham. On his return that night he went into the room where the witness, defendant and the other children were, and said that he had armed himself, that he wanted it well understood that he intended to settle this difficulty. He then started to the room in which he slept, and as he started dropped a bullet, which witness' little daughter picked up.

When the defendant went to see the bondsmen, the

witness was afraid to stay in the house, and went to the barn, where the children were milking, and remained there until the defendant returned. While there she saw the deceased slipping through the cotton rows, until he got behind a hay-stack which stood near the road which defendant had to travel going to and from where the bondsmen lived. Late in the evening the defendant returned, but before he got to the hay-stack he diverged from the road as though to avoid something, came on to where witness and the children were, and all went to the house together. This was on the evening before the killing.

Early next morning the deceased broke open the witness' room door, and ordered Henry to get up and make a fire. The defendant got up and made the fire, and Henry got witness to fix his arm in a sling. The defendant, after making the fire, went down to feed, and when through, came back to witness' room and said to her, "Pa is in a terrible rage this morning." The witness' room was north of and adjoining the stove room. While the defendant was in witness' room, the deceased came into the stove room, where witness was getting breakfast, and got some water in a wash-pan. As he was going out he said, " This thing has got to be settled right now, if there are none left to tell tales." In a very short time he came back to the stove room door, ran his left hand in his pocket (witness did not see his right), and stepped in the door with his left foot, his left side turned towards defendant, who was standing in the door between the rooms, and was stooping to avoid the top of the door, which was very low. The defendant then jerked the witness back, and exclaimed, " Pa, this is no way to settle difficulties," and raised his gun and fired as deceased stepped in the door. Defendant was so weak from a recent spell of sickness that he could scarcely raise the gun; was very much excited and was shedding tears, and the children were screaming at the top of their

voices.    The killing was done on the 24th of February, 1875.

On cross-examination, the witness stated that after the deceased was released from jail in December, 1874, he lived at home with the exception of a few weeks he boarded at Carpenter's.    He slept in his own room.    Witness and defendant had each a spell of sickness during the month of January..    The deceased sat up but one night, and Carpenter was there that night.    The deceased had no opportunity to kill the witness from the time he went to Honey Grove to fight the duel up to the time that he was killed, as either the defendant or Pope Guthery were with her at the house all the time.    Witness testified before the coroner's jury.    If she stated then that deceased put his right foot in the door, made no demonstrations, but stood in the door with his right hand on the facing, she does not remember it.    She was so weak at the time she could sit up only with much difficulty.    It was immediately after the shooting, and she was so much confused she hardly knew what she was doing.    She did not go out where the deceased's body was lying, but sent the children out to protect it from the fowls.    The defendant was 26 years old on trial.

Mrs. Nannie Guthery, daughter of the deceased and the last witness, testified substantially as her mother, but to a few additional facts.    Referring to the morning that deceased was to fight the duel, on which the last witness testified the gun was pointed through the crack at the chimney, Mrs. Guthery testified that she saw her father, the deceased, priming or picking powder into the tube of his gun, at a point immediately south of the house, and thinks that, when through, he capped the gun.    She saw him start towards Mrs. Bright's room, to which she went.    She then describes the occurrences as described by her mother, except that she was not in a position to see the muzzle of the gun said to have been inserted in the crack.

She stated that she was the daughter who picked up the bullet dropped by the deceased on the night of his return from Bonham, and that, when she offered it to him next morning, he said "never mind," that he had "plenty more." She had told defendant of this. She stated further that she heard her father, when he turned from the door on the morning of the killing, when he called Henry to make the fire, say that he "intended to put yesterday's words into effect;" and she heard Henry tell defendant, the evening before, that the deceased said that morning that he intended to kill defendant before twenty-four hours. This witness described the attitudes and positions of the parties at the killing exactly as did Mrs. Bright, except that she stated that it was his right hand the deceased run in his pocket as he stepped into the door when shot. Otherwise her testimony recapitulates her mother's.

On cross-examination she stated that she did not remember having stated before the coroner's jury that the deceased had stopped in the door with his right hand on the facing, when shot.

Henry Bright, a brother of the defendant, testified that, one evening about the last of December, after deceased had been released from jail, and while he was boarding at Carpenter's, the deceased rode up to defendant and witness near a well, and had some conversation with them. During the time, the deceased put his hand in the left side of his bosom, or in his coat pocket, looking straight at defendant, and witness heard something in his pocket click twice, like a pistol. Deceased rode off without saying anything after the clicks. Referring to the evening before the killing, he testified that while he and deceased were at work in the cotton patch, they saw the defendant ride off, and deceased asked him if he knew where defendant was going, and he answered that he did not. The deceased then said that defendant was going

to get his bondsmen to give him up, and that he, deceased, intended to kill defendant before twenty-four hours. Witness told defendant of this threat, that evening, in the presence of his mother and sisters. He stated that, on the morning of the killing, after defendant had gone to the horse-lot, he and others in the house heard loud talking in the direction of the lot, and his mother sent him to see what was the matter. On going out he saw defendant coming towards the house with deceased following, talking angrily and excited. About half way between the lot and house, deceased caught up with defendant, took him by the arm and said, "I tell you that this taking sides with your mother has got to stop or I'll put you out of the way." Defendant pulled loose and went into Mrs. Bright's room, into which witness followed. Some conversation between defendant and Mrs. Bright ensued, but witness' arm pained him so that he paid no attention to it. He did not see the gun fired.

Mrs. Yoakum, for the defense, testified that herself and husband, on or about the 3d of November, 1874, stayed all night at the house of deceased. About ten o'clock that night, the witness and Mrs. Bright went to bed in the big room. Shortly afterwards the deceased came into the same room and made a pallet on the floor at the foot of the bed, whereupon Mrs. Bright got up, went · to her own room, and sent her daughter Nannie to sleep with witness. At a late hour the witness fell asleep, leaving the lamp burning. Between midnight and day the witness was awakened by some one creeping along the floor in sock-feet. The lamp was out, and the person appeared to be approaching a table from the pallet. When the person got to the table witness heard something rattle like caps. The person then turned to that portion of the room where the gun-rack was, over the door, and took down something which witness supposed to be a gun. The person then passed out of that door into a shed-room,

and out of the shed-room door that led outside of the house. The witness saw the deceased about sun-up next morning. He was standing near the southeast corner of the shed-room, close to a locust tree, loading a gun. After loading the gun he seemed to cap it, and after that he started west towards Mrs. Bright's room. Witness was then standing in the door of the southeast shed-room. When deceased started he slipped along with his gun in a shooting position, as though he was going to shoot something. The witness then ran into Mrs. Bright's room, and her narrative from here regarding deceased's effort to force the door, and subsequently calling for his baby to say good-bye, which was taken to him by witness and her husband, is substantially as related by other witnesses.

Adam Yoakum testified for the defense. He saw deceased approaching Mrs. Bright's room from the southeast shed-room in manner as described by the last witness, and prevented defendant from opening the door. He then went with deceased to Honey Grove, and with others had him put under peace bonds, subsequently becoming one of his bondsmen.

Jeff Bright testified that when deceased left the door and went towards the chimney he cocked his gun, but witness did not see what he did with the gun.

John Blair testified for the defense that he examined the premises the morning of the shooting, after the killing, and saw shot holes in the smoke house in range of the positions said to have been occupied by deceased and defendant when the shooting occurred. The shot struck about three feet from the ground. The outside door, through which deceased is said to have started when shot, is about four and a half feet high. The floor of the door in which defendant is said to have stood when he shot is seven or eight inches higher than that of the other door

spoken of. Deceased was about 42 years old, and small but very stout.

Recalled by the State, in rebuttal, McElwee testified that during their sickness in January, deceased sat up two nights and waited on Mrs. Bright and defendant. Carpenter testified to another, and still another night he saw deceased waiting on them. McElwee, R. T. Williamson and J. B. McKee, also testified, in rebuttal, that they were members of the coroner's jury, and that before that jury both Mrs. Bright and Nannie Bright, now Mrs. Guthery, testified that, when the deceased was shot, he had just stepped his right foot up on the door, placed his right hand on the facing and was making no demonstrations.

On the contrary, V. Peyton, a member of coroner's jury, and W. E. Dailey, the justice of the peace who held the inquest and took down the evidence, testified, in rebuttal to the State, that both Mrs. Bright and Mrs. Guthery testified before the coroner's inquest that the deceased was advancing and entering the door when he was shot.

The defense moved for a new trial, but the court below overruled the motion, and the defense gave notice of appeal.

*R. B. Semple*, for the appellant. (1) The first error complained of by appellant is that the court erred in failing to charge the jury that insulting words or conduct of the person killed towards a female relative of the party guilty of the homicide are adequate cause to reduce the killing from murder to manslaughter. Art. 597, Penal Code.

(2) The second error is that the court erred in failing to charge the jury that homicide is permitted in defense of another when it reasonably appears by the acts, or by the words coupled with the acts, of the person killed that he

intended to take the life of such third person or do him some serious bodily injury. Arts. 570, 572, 574, Penal Code.

(3) The third error is that the court erred in charging the jury that where the killing takes place in defense of another the threatened violence must show that the party killed either intended to take the life of such third party or deprive him of some member of the body, when the statute says that such violence must only be such as produces a reasonable expectation or fear of death or some serious bodily injury. Art. 574, Penal Code.

(4) The fourth error is that the court erred in charging the jury that if they did not find that the killing took place in pursuance of a deliberately formed design, they should find the appellant guilty of murder in the second degree; which, appellant respectfully submits, is in effect to charge the jury that if they did not find him guilty of murder in the first degree, they should in any event find him guilty of murder in the second degree, as they did do.

*Horace Chilton,* Assistant Attorney General, for the State.

HURT, J. The appellant was convicted of murder of the second degree, and his punishment assessed at confinement in the penitentiary for the term of twenty-two years. This case was submitted at the Tyler term, and we have had it under consideration from that time until now, giving it our most serious attention.

There is but one point seriously urged by counsel why the judgment should be reversed, and that is a supposed defect in the charge of the court. After having given the charge, time after time, the most thorough examination commensurate with our humble ability, we are forced to the conclusion that the law of the case was given therein to the jury.

[The reporters will give the evidence and charge of the court.]

There were two theories — one inculpatory and the other exculpatory. The jury, whose duty it was, passed upon these theories, finding in favor of that of the State. The presiding judge was called upon (by motion for new trial) to review the correctness of their finding. It being approved by him, who heard the witnesses, saw their bearing and manner of testifying, we are not prepared to say that their finding was wrong. If the theory of the State was true, the defendant was guilty of murder, at least, of the second degree. There was evidence clearly and satisfactorily supporting that theory, and the jury having by their verdict passed upon and determined which of these conflicting theories was true, we will not disturb their conclusion.

There is no question presented in the record which has not been ably and exhaustively discussed by this court in cases already reported. *Kendall* v. *The State*, 8 Texas Ct. App. 569; *Ainsworth* v. *The State*, 8 Texas Ct. App. 532. See also *Horbach* v. *The State*, 43 Texas, 258. And see also those cases for thorough discussions of the law bearing on this case. The judgment is affirmed.

*Affirmed.*