## QUIRINO GAITAN *v.* THE STATE.

1. PRACTICE IN THIS COURT — EVIDENCE.— The admission of evidence by the trial court will not be revised on appeal unless it was objected to at the trial, either when it was offered or subsequently by motion to exclude it from the jury, nor unless the objections themselves are disclosed and verified by the record.

2. MURDER OF THE FIRST DEGREE — PROOF OF EXPRESS MALICE.— To warrant a conviction for murder of the first degree, it is incumbent on the State to prove that the killing was done on express malice, and with a sedate, deliberate mind and formed design; but nevertheless a homicide may be murder of the first degree although the result of the sudden execution of an immediate resolve to kill or to inflict serious bodily injury which may result in death, and in such cases the *indicia* of express malice may be evidenced by the cool, calm and circumspect deportment of the slayer at the time of the fatal act, and immediately anterior and subsequent thereto,— by the absence of a provocation or exciting cause,— by the nature of the fatal act itself, and the character of instrument used, as well as the manner of its use,— by declarations indicative of the state of mind or the motives of the slayer,— or by other evidential circumstances pertinent to the issue.

3. SAME.— It is not necessary that the evidence of express malice shall demonstrate it to mathematical certainty. The requisite degree of certainty is such as is reasonably sufficient to satisfy and convince the jury.

4. DRUNKENNESS.— In a trial for murder the defense, with reference to the question of manslaughter, asked the following instruction to

the jury: "You may take into consideration the fact that the defendant was intoxicated at the time of the commission of the crime, in deciding the adequacy of the cause of the passion under which he acted, or if the cause of his passion was adequate in law to reduce the crime from murder in the second degree to manslaughter." *Held*, properly refused by the court below because incorrect as a legal proposition. The ebriety or inebriety of the slayer cannot affect the existence or non-existence of the "adequate cause" without which there can be no manslaughter.

5. FACT CASE.— See evidence held sufficient to sustain a conviction for murder in the first degree.

APPEAL from the District Court of Cameron. Tried below before the Hon. JOHN C. RUSSELL.

The indictment in this case was presented on December 17, 1881, and charged that the appellant, on or about the 13th of the preceding August, did feloniously and of his malice aforethought cut, stab and kill Luz Contreras with a certain knife. The cause came to trial in the latter part of December, 1881, and the trial resulted in a verdict which found the appellant guilty of murder in the first degree, and assessed his punishment at death.

The defendant and the deceased and most of the witnesses were Mexicans, and the developments at the trial are somewhat characteristic. The homicide was committed at or about midnight, in immediate view of many persons who were looking on at a *baile* or *fandango*,— a dancing party or ball,— assembled at the "fandango grounds" of the city of Brownsville.

Juan Ruiz was the first witness introduced by the prosecution. He stated that on the night of August 13, 1881, he was acting as special policeman of the city of Brownsville, and was on duty at a baile or fandango in the suburbs and within the limits of the city. Witness saw Quirino Gaitan, the defendant, there in company with Simon Delgado and Juan Medina. They were walking about the fandango grounds, and defendant was annoy-

ing some of the people there by acting in a disorderly manner. Witness warned him once or twice, and told him to behave, and that he had better go outside of the ball ground. Defendant said all right, and that he would do so, and the witness saw the defendant and his companions go outside of the enclosure where the dancing was going on, and observed the defendant walking beyond the row of benches on which the people were seated. Suddenly, at a spot where the defendant was, the people rushed together and separated, and then the witness saw the defendant spring out of the crowd, with a bowie knife in his hand. Witness ran to the scene of the disturbance, and there found Luz Contreras, the deceased, covered with blood, with a knife-wound in the abdomen, and dying. Some one cried out "Quirino Gaitan has killed Contreras." Witness then went back into the dancing ground. He saw the defendant go across the dancing ground at a rapid gait, and, holding his knife over his head, saw him jump over the benches and run for the fence. Witness followed the defendant, and the latter fled. Witness called out, "Quirino Gaitan, surrender!" Defendant replied, "I will show you how I will surrender, you son of a bitch," and, turning, rushed on the witness. At this stage of his testimony the witness explained that he was advised by his legal counsel not to state what next ensued between the defendant and himself, but he received a knife wound and was not able to arrest the defendant, who was arrested by some other person. When witness got back to the dance-ground, he was told that Contreras was dead. A butcher knife was exhibited which the witness identified as the knife which the defendant had at the dance the night Contreras was killed. Defendant habitually carried such a knife, but witness had been informed that the particular knife in question belonged to Ambrosio Gaitan, the brother of the defendant. The deceased Contreras was a hackman, and

had his hack on the grounds. He was standing outside the row of benches on which the people were seated, and was twenty or thirty feet from them, looking after his hack and team. He was a good, honest, hard-working, quiet and peaceable man, and was generally known as such a man. When witness told defendant to go outside the dancing enclosure, the latter went direct to where the deceased was standing. Witness observed him up to the time the people made the rush, and then saw him, with the knife in his hand, spring back from where Contreras was standing.

Miguel Gatica, for the State, testified that he was at the ball the night of August 13, 1881, when Luz Contreras was killed. Witness was walking along behind the defendant and the latter's two companions, Juan Medina and one Simon whose surname was unknown to this witness. Defendant and his companions had just passed by where the witness and some friends were eating watermelons, and witness followed a few feet in their rear. Witness observed the defendant swagger to one side and step on the foot of Contreras, who was standing near the corner of the dancing ground, but outside of the row of benches on which the people were seated. Contreras was speaking to no one and doing nothing. When the defendant stepped on his foot he said, "Why, my friend, are you driving a cart?" The defendant replied "Why; don't you like it?" and Contreras responded "Why should I like it?" Then the defendant cried "See how you like this, then!" drew his knife and, with an expression too filthy for repetition, plunged the knife into the abdomen of Contreras. Defendant then ran into the dancing ground, and Juan Medina followed close behind him. In trying to put the knife back into his belt the defendant let it fall, and as he stooped to pick it up he said to Medina "Never mind; I have fixed him." Defendant then went across the dancing ground, and witness saw no more of

him. After Contreras was stabbed he stood for a moment with his arms folded across the wound, saying nothing, and turned and walked to his horses and leaned against them. A boy took him by the hand and said "What is it?" and he only replied that it was not serious. Then he fell to the ground and expired within a few moments.

Before the defendant trod on the foot of deceased the latter had not spoken a word, and all he then said was the expression "Why, friend, are you driving a cart?" He made no motion with his hand behind him, nor any other threatening gesture; nor did he use any bad language towards the defendant. After he died his body was examined, and there were no weapons of any kind upon it or anywhere about the spot where he was killed. The defendant was walking straight before he swaggered to one side and stepped on the foot of the deceased. It was midnight when the deceased was stabbed, and he did not live ten minutes after the wound was inflicted. The stab was the full width of the knife, and in the abdomen somewhat on the left side.

Juan Medina, for the State, testified that he knew the defendant well, had known him for years, and had been his companion and friend. On the night of August 13, 1881, witness accompanied defendant and his family to the ball. Witness, together with defendant and Simon Delgado, was walking about in the dancing enclosure when Ruiz, the policeman, told the defendant he had better go outside the enclosure and not annoy the families. Defendant and witness and Delgado passed out through the aisle left between the benches, and proceeded beyond the row of benches until they came to the corner of the ground where Luz Contreras was standing; and at that point the defendant swaggered to one side and stepped on the foot of Contreras, who, speaking to the defendant, said, "Friend, are you driving a cart?" Defendant answered, "Why, what of it, don't you like it?" and Contreras re-

replied, "How should I like it, senor?" Then the defendant said, "Cabron! (a very insulting epithet) take this then and see how you like it," and, using an infamous expression to Contreras about his mother, plunged his knife into the abdomen of Contreras, near the left side. The defendant immediately went rapidly into the dancing ground, holding the knife in his hand, and, as he was attempting to put the knife into his belt, it fell and he stooped to pick it up, saying in Spanish, "Never mind, I have fixed him." Witness ran behind the defendant into the dance ground, but did not follow him farther. The defendant ran and jumped over the benches, with the knife in his hand and the policeman in pursuit of him. Contreras, the deceased, had made no remark before his foot was stepped on by the defendant. He made no movement as if to draw a weapon, nor did he make any threat or threatening gesture. When the defendant, with witness and Delgado, approached Contreras, the latter was standing outside of the dance ground, and near his hack. If Contreras had made any offensive movement towards defendant, the witness said he would certainly have observed it. Defendant, witness and Delgado had just come from the interior of the ball ground, and were promenading around when the affair occurred. Defendant had not stopped to speak with any one. Witness did not see Antonia Gaitan, defendant's sister, sitting near the place at which Contreras was standing. Before encountering Contreras the defendant did not go to where the women were sitting; but, after he stabbed Contreras, he ran over to where his sister Antonia was sitting and spoke to her before he ran away.

This witness stated that he testified at the inquest held upon the body of the deceased, the day after the killing. When first called as a witness on that occasion he was afraid to tell all he knew, because he knew the bad character of the defendant and his brother Ambrosio, and

knew they would do him some injury if he testified against the defendant.   At the inquest he first stated that when the trouble began he ran away and did not see the end of it; but afterwards, and on the same day, he returned before the inquest and told the whole truth just as he had been relating it on this trial.   Witness had been threatened by the Gaitans if he should testify against the defendant, and he was afraid of them.   The defendant had taken a drink or two the night of the ball, but he was not at all drunk, and he knew very well what he was doing.   Once or twice he acted as if he was drunk, but that was before he went outside of the dancing ground. When he approached where the deceased was standing he was not drunk and did not stagger.   Nor was witness himself drunk on that occasion.   With the testimony of this witness the State rested.

Joseph Hull was the first witness introduced by the defense.   He stated that he was a resident of the city of Brownsville, and was at the ball the night Luz Contreras was killed.   He was then in company with defendant's sister, Antonia Gaitan, and was standing and talking with her when the defendant with two companions passed by.   Witness saw the defendant step up to Luz Contreras, the deceased, and heard the sound of their voices as if in conversation with each other.   He heard the voice of each of them, but could not understand anything said by either.   They were talking in an ordinary tone of voice, and not in a loud or excited tone or manner.   Witness was not paying particular attention to them, but presently he observed Luz Contreras put his hand behind him as if to draw some kind of weapon, perhaps a knife or a pistol.   Then the defendant rushed on Contreras and stabbed him.   Contreras did not actually draw any weapon, because as he put his hand behind him the defendant stabbed him.   Witness was on the right of Contreras when the latter put his hand behind him, and witness

saw the motion quite distinctly. The moon was shining brightly, and there were a great many lights about the ball grounds; and a person could see quite plainly. Before the blow was struck, and while the defendant was talking to the deceased, the witness observed that his woman, Antonia, looked scared and angry; but he could not say why she did so. While the defendant, witness and Delgado were coming along, the defendant was joking about some candy he had won in a raffle on the grounds. He had the candy in his hand and gave some of it to his sister Antonia. A diagram of the grounds, showing the positions of the different persons, was shown to and approved by the witness.

On his cross-examination the witness stated that he lived with Antonia Gaitan, the defendant's sister; she was witness's woman or mistress. He was not married to her, but had been keeping her for more than two years. She had a husband living. Witness did not see the deceased talking to her, and had never stated that the deceased was talking to her. At the examining trial witness stated that he himself was talking to her near where Contreras was standing, when the latter was cut. At the examining court the witness did swear that he knew nothing at all about the matter, but in saying so on that trial he did not tell the truth. At the time he did not want to tell what he knew, and had his reasons for not wanting to tell, but declined to state what those reasons were. His present testimony, nevertheless, was the truth. When the defendant approached the deceased, the latter was standing about fifteen steps from the benches on which Antonia was sitting with other women.

Ramon de la Rosa, for the defense, testified that he was at the ball on the night of August 13, 1881, when Contreras was killed by the defendant. Coming towards the spot at which Contreras was standing, outside of the row of benches, the witness observed the defendant standing

in front of Contreras. Witness heard the defendant, speaking to Contreras, say something like "It is not as you say," and use a bad expression at the same time. The defendant lunged forward and plunged his knife into the body of Contreras. Defendant was the only person close to Contreras, who was standing with his arms folded across his breast, doing nothing. Witness did not hear Contreras speak to the defendant or any one else, and was certain he made no threatening gesture towards the defendant. Had he made a movement as if to draw a weapon, or any offensive movement against the defendant, the witness was positive he would have seen it. Antonia Gaitan, the sister of the defendant, was sitting with other women on the benches around the dancing ground, and was ten or fifteen steps from where the deceased was stabbed. After the blow was struck and the defendant had run away, witness heard Antonia Gaitan call out not to kill her brother; this was while the pursuit of defendant was going on, and some one was shooting at him. Witness saw the deceased, after he was cut, walk to his horses and lean against them, and within a few moments saw him dead on the ground at the same spot. It was about midnight when these things occurred. The witness did not at the time know Juan Medina, and could not say whether Medina was near by when the deceased was killed. An ordinary butcher-knife, with a blade about eight inches long and an inch and a half wide, being exhibited to the witness, he said it looked like the knife used by the defendant on the occasion in question.

Antonia Gaitan was the last witness introduced by the defense. She testified that in the night of August 13, 1881, she was at the ball, and was sitting with other women on the benches around the dancing ground, when Luz Contreras came up and accosted her. He asked her if there was any reason why he should not sleep with

her that night.    She got frightened at this,— "was scared because Contreras made her ashamed before the women." Contreras turned and walked away, but witness was still scared when her brother, the defendant, came to her and said, "What is the matter, Nina; why are you scared?" Witness did not tell him why she was scared, because there was no necessity to tell him; he had already heard Contreras when the latter said the bad thing to her.    Defendant gave witness some candy which he had won in a raffle, and then he walked over to where Contreras was standing, a few feet distant, and witness heard the defendant talking to Contreras.    Then she saw Contreras draw out a big knife to kill her brother with, and then her brother, to save himself, had to kill Contreras.    Witness saw the knife when Contreras had it in his hand; he had it raised and in front of him, trying to cut the defendant.

On the cross-examination of this witness she stated that she knew when the inquest on the body of Contreras was held before the justice of the peace, and knew at the time it was held that her brother was being charged with the crime of murder.    She was in town when the inquest was held, and at that time knew all the facts she now swore to.    She did not appear or testify at the inquest, because she was not sent for.    She would not have come now if she had not been sent for; because she was not willing to go to court unless she was asked or told to do so.    She stated that a good many persons must have overheard what Contreras said to her, but she could not name them because she could not remember who the women were who were sitting near her at the time Contreras addressed the bad language to her.    She was much alarmed by his telling her that he wanted to sleep with her.

The defense having closed, the State, in rebuttal, introduced George More, who testified that he was at the ball in the night of August 13, 1881, when Luz Contreras was

killed, and saw the body of the deceased near his horses. He saw the fatal wound; there was but one, and it was in the abdomen of the deceased, on the left side. Witness saw the body examined just after the killing; no weapons were found on or near it. The witness knew Luz Contreras as a good, peaceable, quiet and industrious man. Witness was clerk of the inquest held upon the body of the deceased, and heard Joseph Hull testify on that occasion. At first Hull swore positively that he knew nothing about the killing of Contreras; but, after a good deal of questioning, he made a statement which the witness took down in writing, and which Hull signed by making his mark to it. This document being produced, it was identified by the witness, and then read in evidence to the jury,— as follows:

"I was standing at the candy shop when Quirino Gaitan and Juan Medina came up to the candy shop. Gaitan won some candy at a game they were playing; he then walked off towards the entrance of the baile. I seen Luz, the carriage-driver, standing a short distance from where I was standing talking to my woman, Antonia Gaitan. I seen Quirino Gaitan make a rush or plunge on Luz Contreras, the carriage-driver. Contreras, the carriage-driver, then put his hand up to his stomach, and walked off in the direction of the carriages. Attached diagram shows as nearly as possible the position of the parties at the time of the cutting." The diagram here referred to places Hull at a somewhat different standpoint from that designated in the diagram approved by Hull in his testimony at bar, and in some other particulars the two diagrams do not correspond.

Resuming his testimony the witness More stated that Juan Medina testified twice before the jury of inquest. In his first statement to the inquest Medina did not tell all he had stated in his testimony at the pending trial; but he voluntarily returned before the inquest and said

he wished to tell the whole truth about the matter,— saying he had been afraid to tell it all because of the Gaitans,— and then he related to the inquest the same facts he had testified at bar.

J. I. P. Franklin, for the State, testified that he was at the spot where Contreras died, and saw the body within a few moments after death and before it had been touched. There were no weapons of any kind on or near the body. Deceased was lying near his carriage horses, thirty feet or more from the nearest benches, and a greater distance from those on which the women had been sitting. Witness saw the defendant that night, at the ball. Defendant looked as if he was slightly intoxicated, or else he was acting as if he was drunk; witness could not say which, but at that time he concluded that the defendant was only acting drunk, as men at fandangoes often do. Witness saw the defendant when the latter ran away; he did not appear to be drunk then. The witness pursued the defendant, and fired at him. This concluded the evidence in the case.

With reference to manslaughter and the testimony of Antonia Gaitan, the court below charged the jury as follows:

"15. Insulting words or conduct of the person killed towards a female relation of the party guilty of the homicide are deemed in law adequate causes.

"16. When it is sought to reduce the homicide to the grade of manslaughter by reason of the existence of the cause specified in the next preceding paragraph, it must appear that the killing took place immediately upon the happening of the insulting conduct or uttering of the insulting words, or so soon thereafter as the party killing may meet with the person killed after having been informed of such insults; and the jury are at liberty to determine in every case whether, under all the circumstances, the insulting words or gestures were the real cause which provoked the killing."

" 18. You are further charged that if the proof satisfies you that the defendant was a relation of Antonia Gaitan, and the proof further satisfies you that the deceased had used insulting words or conduct towards her, and it further appears from the evidence that the killing took place immediately upon the happening of the insulting words or conduct, or so soon thereafter as the defendant met the deceased after being informed of the same; then, under the law of manslaughter, the defendant is guilty of manslaughter, and you will so find in that case, and assess his punishment at not less than two and not more than five years' confinement in the State penitentiary."

The defense moved for a new trial, but the motion was overruled.

*J. C. Scott*, for the appellant.    The court erred in permitting the jury to take with them in their retirement extracts from the depositions of Joseph Hull.    At the coroner's inquest held over the body of the deceased, Luz Contreras, August 15, 1881, the above named witness was called and deposed as to what he knew of the stabbing of the deceased.    By reference to the statute regulating the taking of depositions in criminal cases before examining courts, and also to the transcript of this case, it will be seen that none of those circumstances concur which make it possible for the State in this case to introduce those depositions at the trial, much less to permit the jury to take them into the jury room when they retired to consider a verdict.    Criminal depositions are unknown to the common law, and statutes creating them and regulating their introduction as evidence must be *strictly construed.*    Not only this, but it appears from the words of the statute that their introduction can under no circumstances be legal unless the requirements therein contained be fully complied with, and it does not appear to alter the case that it was sought to impeach a witness

by their introduction, which was the object in view when they were introduced in the present case.

These depositions are not sworn to by the district or county attorney, or by any other credible person as required by law, and furthermore the witness Joseph Hull was there in court and had just testified. Code of Crim. Procedure, arts. 772 and 773; *Johnson* v. *State*, 27 Texas, 765.

The court erred in overruling the motion for a new trial, for the reasons therein assigned why a new trial should be granted.

*First.* The State did not prove by circumstantial or positive evidence that the defendant acted with *express malice.*

Express malice is said to exist when one person kills another with a *sedate, deliberate* mind and *formed design.* Such *formed* design may be evidenced by *external circumstances* discovering the inward intention, as by lying in wait, antecedent menaces, former grudges and concerted schemes to do the party some bodily harm.

Malice of all kinds must be inferred, because it consists in a quality or state of the mind either actual or imputed. Its actual existence may be manifested by *external circumstances* from which it may reasonably be inferred. *In the absence* of these external circumstances which make it manifest, it is in some cases *imputed* as a legal inference without reference to whether it exists in fact or not.

From this it would appear that the State must show the existence of some "external circumstance," such as "lying in wait, antecedent grudges or former menaces," from which could be inferred the contested point that the defendant at the time had a *formed design* to do the deceased "some bodily harm."

If a man kills another *suddenly without any* or without a considerable provocation, the law *implies malice.* (4 Bl.

200; 20 Texas, 530; Hale, P. C. 455; 5 Yerg. 340.)  But it is equally well understood that the law never implies *express malice.*

By an examination of the record it will be found it does not contain a particle of testimony showing "antecedent grudges or former menaces," or any other circumstance from which a preconceived and deliberate intention to do the deceased some bodily harm could be inferred. On the contrary, the transcript shows that at the time of the stabbing the defendant was intoxicated.  In this condition it was even impossible for the State to prove the existence of express malice.  For, even then the defendant must have a deliberate and sedate mind, and this certainly could not be the case when his reason was dethroned by whisky.  While under the new law intoxication evidently does not mitigate the penalty for an offense, at the same time it appears that the statute above referred to does not obviate the necessity of the State proving the existence of express malice.

The fact that the circumstances of killing occurred so quickly and that deceased called the defendant "amigo" (friend) is further proof that there was no malice aforethought.  *McCoy* v. *State*, 25 Texas, 37; *Farrer* v. *State*, 42 Texas, 265; *Brown* v. *State*, 4 Texas Ct. App. 276; *Colbath* v. *State*, 4 Texas Ct. App. 80; Wharton on Homicide, § 35.

*Second.* The defendant was not guilty of murder in the second degree.

Under the express words of the statute, insulting words used by the deceased to a female relative of the defendant are sufficient cause to reduce the crime to *manslaughter.* But the fact that it was proven at the trial that Luz Contreras made the insulting proposition to the sister of the defendant seems to have been utterly ignored by the jury.

Admitting that Antonia Gaitan was a woman of bad character, as in fact she was in so far as she was the ac-

knowledged mistress of Joseph Hull, her testimony certainly could not be attacked on *that score*, much less wholly disregarded and held for naught, as seems to have been the case.  Penal Code, art. 597.

*Third.* The defendant killed the deceased in the lawful defense of his person and life.

Proof was produced at the trial showing that the defendant had good reason to believe that deceased intended to making a deadly assault on him, and he need not have retreated.  Penal Code, arts. 572 and 574; *U. S.* v. *Wilterberger*, 3 Wash. (C. C.) 517; *Shorter* v. *The People*, 2 Comst. 193; *State* v. *Harris*, 1 Jones (N. C.), 190; *Pond* v. *The People*, 8 Mich. 150; 1 Bishop's Crim. Law, 135.

*H. Chilton*, Assistant Attorney General, for the State.

WHITE, P. J. Appellant was tried upon an indictment charging him with the murder of one Luz Contreras in Cameron county on the night of the 13th day of August, 1881.  He was found guilty of murder of the first degree, and by the verdict and judgment rendered his punishment was assessed at death.

Several grounds are set forth in the motion for new trial, the principal one being that "the court erred in permitting the jury to take with them in their retirement extracts from the testimony of Joseph Hull."  It appears that the evidence embraced in this ground of complaint was the deposition of the witness as taken at the coroner's inquest held over the body of the deceased on the 15th of August, 1881.  As stated and argued in the brief of appellant's counsel, the objection to this evidence was that the prerequisites of the statute [Code Crim. Proc. arts. 772, 773, 774] had not been observed in the preparation of the evidence, nor complied with in the proposed introduction of said testimony.  Whether these objections are well founded or not, it is impossible for us to

determine from the record.   No objection to the admissibility of the testimony appears to have been interposed by defendant at the time it was offered, and no subsequent motion was made to exclude it; and there is no bill of exceptions showing the objections and verifying their correctness.   This should appear in the record, else there is nothing in the points made upon which this court can pass advisedly.   *Ballinger* v. *State*, on motion for rehearing, decided at the present term, *ante*, p. 323. For aught that appears the evidence went to the jury without objection from defendant, and he is in no attitude permitting him to complain of its admission now.   *Johnson* v. *State*, 27 Texas, 758.

Another objection insisted upon against the validity of the judgment is that the evidence fails to show express malice, the essential ingredient of murder of the first degree; and it is contended that if the killing was not upon self-defense then the crime was manslaughter, or at most murder in the second degree.   All of these issues were submitted by the court in a charge to the jury which is characterized by apparent fairness and sufficiency.

It is true that the express malice necessary to constitute murder of the first degree must be shown, and shown too as the result of a sedate, deliberate mind and formed design to kill.   "But, as has been frequently held by this court (as was said in *Farrer* v. *State*), it does not follow, because the killing may be the result of the prompt and speedy execution of a hasty or immediate resolution, that it may not have been done with express malice.   The law has no scales to measure the time in which a sedate, deliberate mind may reach a formed design to kill or to do some serious bodily injury which may probably result in death.   When such design is once formed, the haste with which it is put in execution in no way affects or modifies the character of the act, or the degree of guilt thereby incurred.   As the difference in the degree of murder does

not result from the length of time taken to form the design, or the speed with which it is executed, but upon the state and condition of the mind in which the design is formed, it is obvious that it will often be difficult, in homicides without antecedent explanatory facts showing their true character, to determine to which class the particular case under consideration belongs. It is always to be borne in mind, however, whatever difficulty there may be in establishing the fact that the killing was with express malice, still it is incumbent upon the State to prove it before the accused be properly convicted of murder of the first degree. This may be done by proof of the cool, calm and circumspect deportment and bearing of the party when the act is done, and immediately preceding and subsequent thereto; his apparent freedom from passion or excitement; the absence of any obvious or known cause to disturb his mind or arouse his passions; the nature and character of the act done; the instrument used as well as the manner in which the murder is committed; declarations indicating not only the state of the mind but also the purpose and intent with which he acts, and the motives by which he is actuated; and all such other matters and things pertinent to the issue which may be suggested by the facts." *Farrer* v. *State*, 42 Texas, 265.

Thus it will be seen that, whilst express malice must be proved, it is not required that it should be demonstrated to mathematical certainty by the evidence; all that is required is that the evidence be such as might be reasonably sufficient to satisfy and convince the jury of its existence. *Richarte* v. *State*, 5 Texas Ct. App. 359; *Jackson* v. *State*, 9 Texas Ct. App. 114. No evidential fact can be demonstrated. Whart. Cr. Evid. § 7.

Upon the theory of the defense that the killing was prompted by passion aroused on account of insults offered by deceased to the sister of defendant, the charge of the

court fully presented the law of manslaughter as applicable to such state of facts. *Eanes* v. *State*, 10 Texas Ct. App. 421.

Amongst other requested instructions asked for defendant and refused by the court, we find the following, viz.: "You may take into consideration the fact that the defendant Gaitan was intoxicated at the time of the commission of the crime, in deciding the adequacy of the cause of the passion which actuated, or if (whether?) the cause of his passion was adequate in law to reduce the crime from murder in the *second degree to manslaughter.*" This instruction is manifestly incorrect as a legal proposition. Manslaughter, under our statute, depends wholly and entirely upon the existence or non-existence of *an adequate cause* sufficient to render the mind incapable of cool reflection. Penal Code, art. 593 *et seq.* There can be no manslaughter which is not predicable upon *adequate cause.* *Hill* v. *State*, decided at the present term, *ante*, p. 456. Whether the party committing the homicide was sober or intoxicated cannot affect the question of the existence or non-existence of such adequate cause, and without the adequate cause there can be no manslaughter. As was said in *Farrer's* case, *supra:* "It is therefore quite obvious that the mere fact of being drunk, or the mere mental excitement or ungovernable passion and rage which may be engendered by drinking intoxicating liquors, will not mitigate the criminality of a voluntary killing below the grade of murder." 42 Texas, 272.

Evidence of intoxication or drunkenness is of vital importance only in the class of offenses in which criminality depends solely or to a certain degree upon the state or condition of the mind at the time the wrongful act is done, showing the ability or inability of the mind to form or entertain a sedate or ordinate criminal design. *Ferrell* v. *State*, 43 Texas, 503; *Scott* v. *State* (present term). Such evidence may be essential in determining the degrees of

murder, or in showing total want of criminal intention, and consequent immunity from any responsibility whatsoever. *Colbath* v. *State*, 2 Texas Ct. App. 391.

When we consider the sufficiency of the evidence in connection with the principles of law above enunciated, we find no occasion or reason to interfere with the verdict and judgment rendered, finding appellant guilty of murder of the first degree. There are in the record before us no circumstances, even the slightest, of mitigation, much less justification or excuse, for the gross, wanton and unprovoked murder by appellant of a quiet, peaceable, inoffensive and unarmed man.

The judgment of the court below is in all things affirmed.

*Affirmed.*